IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| DANIEL ANTHONY LUCAS, | : | |
| Petitioner | : | |
| vs. | : | CIVIL ACTION NO: 5:09-CV-289 (CAR) |
| STEPHEN UPTON, Warden, | : | |
| Respondent | : | |

## **ORDER**

Pending before the Court is Petitioner **DANIEL LUCAS'S** Motion for Leave to Conduct Limited Discovery.

**I.     BACKGROUND**

**A.     Facts**

According to the Georgia Supreme Court, the evidence adduced at Lucas's trial showed the following:

> Lucas and Brandon Joseph Rhode burglarized the home of Steven and Gerri Ann Moss twice on April 23, 1998. During the second burglary of the Moss home, 11-year-old Bryan Moss returned home from school. Lucas and Rhode confronted Bryan and forced him to sit in a chair, and then Lucas fired at Bryan with a .25 caliber handgun, inflicting a non-fatal wound to his upper arm and shoulder. Lucas led Bryan to a bedroom where he shot the boy repeatedly with the .25 caliber handgun. In the meantime, Rhode met 15-year-old Kristin Moss as she arrived from school, placed her in a chair, and shot her twice with a .357 caliber handgun.

> Rhode then shot Steven Moss four times with the .357 caliber handgun as Steven arrived home. Finally, Lucas obtained a .22 caliber handgun from Rhode's automobile and shot Bryan and Kristin Moss both again. Both Bryan and Kristin as well as their father Steven Moss died as a result of any number of these gunshot wounds inflicted by Lucas.
>
> Several witnesses observed Rhode's automobile as Lucas and Rhode fled in it from the Mosses' home. One of these witnesses identified Lucas as the passenger in the automobile. A search of the automobile revealed a recently-used spare tire and damage to both the front and rear bumpers. The damage to the bumpers was shown to be consistent with damage to a propane tank and a cinder block at the Mosses' home. Expert testimony demonstrated that paint left on the cinder block matched the paint on Rhode's automobile. Further expert testimony showed that an impression left in the Mosses' dirt driveway could have been made by the spare tire.

*Lucas v. State,* 274 Ga. 640, 641-42 (2001).

**B.    Procedural History**

On June 30, 1998, a Jones County Grand Jury indicted Lucas for "three counts of malice murder, three counts of felony murder, two counts of burglary, and one count of kidnapping with bodily injury." *Id*. at 640 n.1.  "Lucas's trial began on September 8, 1999, and he was found guilty on all counts on September 16, 1999." *Id*. On September 17, 1999, the jury recommended death for each of the three murders.  *Id*.

Lucas moved for a new trial on October 1, 1999, and the trial court denied the motion, as twice amended, on February 15, 2001.  *Id*.

Lucas filed a notice of appeal, and the Georgia Supreme Court affirmed his conviction and sentence on November 19, 2001.  *Id*. at 640-52.  The Georgia Supreme Court denied Lucas's motion for reconsideration on December 14, 2001. (Resp't Ex. 34).

Lucas filed a petition for writ of certiorari in the United States Supreme Court, which was denied on October 7, 2002. *Lucas v. Georgia*, 537 U.S. 840 (2002). A timely petition for rehearing was denied on December 2, 2002. *Lucas v. Georgia*, 537 U.S. 1068 (2002).

Lucas filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts County, Georgia on August 13, 2003. (Resp't Ex. 40). He amended his petition on March 1, 2007. (Resp't Ex. 84). The habeas court held a three-day evidentiary hearing on July 9-11, 2007 and denied the petition in its entirety in an order dated June 24, 2008. (Resp't Ex. 90-166, 177).

On August 19, 2008, Lucas filed an Application for a Certificate of Probable Cause to Appeal from the denial of habeas corpus relief. (Resp't Ex. 179). The Georgia Supreme Court denied this application on June 29, 2009. (Resp't Ex. 182).

On December 24, 2009, Lucas filed a Petition for Writ of Certiorari in the United States Supreme Court, which the Court denied on March 1, 2010. (Resp't Ex. 185, ECF No. 31-1; Resp't Ex. 188, ECF No. 31-4).

On August 20, 2009, Lucas filed his Petition for Writ of Habeas Corpus by a Person in State Custody in this Court. (ECF No. 1).

## II.	STANDARDS GOVERNING DISCOVERY IN 28 U.S.C. § 2254 ACTIONS

In *Bracy v. Gramley*, 520 U.S. 899 (1997), the Supreme Court explained that "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Id.* at 904. Rule 6 of the Rules Governing Section 2254 Cases ("Rule 6") provides that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." 28 U.S.C. § 2254 R. 6. Furthermore, "[a] party requesting discovery must provide reasons for the request." *Id.* "Rule 6 is meant to be 'consistent' with" *Harris v. Nelson*, 394 U.S. 286 (1969). *Bracy*, 520 U.S. at 909; *see also* 28 U.S.C. § 2254 R. 6 advisory committee's note. In *Harris*, the Supreme Court held that a petitioner establishes good cause for discovery if "specific allegations before the court show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief." *Harris*, 394 U.S. at 300. However, "good cause for discovery cannot arise from mere speculation" and "discovery cannot be ordered on the basis of pure hypothesis." *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006).

In *Isaacs v. Head*, 300 F.3d 1232 (11th Cir. 2002), the Eleventh Circuit held that with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), "Congress modified the discretion afforded to the district court and erected additional

barriers limiting a habeas petitioner's right to discovery or an evidentiary hearing." *Id.* at 1248-49.  The Court found that Isaacs had not been "reasonably diligent in trying to develop the factual record while in state court," and that the district court, therefore, correctly denied his requests for both discovery and an evidentiary hearing. *Id.* at 1249. Specifically in relation to Isaacs's request for discovery, the court held as follows:

> [Isaacs] does not explain why the discovery that he seeks now is any different from the discovery that was available to him in state courts. Under these circumstances, we conclude that the district court properly denied Isaacs' request to conduct additional discovery . . . because he neither exercised sufficient diligence to satisfy the requirements of § 2254 (e)(2) nor showed "good cause" as required by Rule 6(a).

*Id*. at 1250.

In *Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002), the Eleventh Circuit again addressed the issue of whether a habeas petitioner should be granted leave to conduct discovery.  During state habeas proceedings, Crawford had obtained a Georgia Bureau of Investigation ("GBI") report that included information about various stains on a mattress, blankets, and clothing.  One day before the evidentiary hearing in the state habeas corpus court, Crawford moved for independent serological testing on these items.  The state court denied the motion as untimely.  *Id*. at 1328-29.

In his federal habeas action, Crawford asked the district court to order serological testing.  The Eleventh Circuit held that the district court correctly denied discovery because "Crawford failed to exercise sufficient diligence in seeking testing of items

mentioned in the GBI report while in state court." *Id*. at 1329.  The Court held that "in light of both § 2254(e)(2) and Rule 6(a), we conclude that Crawford was not entitled to have the items from the GBI report tested after bringing his case in the federal courts." *Id*.

Thus, a habeas petitioner is entitled to discovery upon a showing of good cause *and* of diligence.[1]  Additionally, it is quite possible that the Supreme Court's recent decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), places additional restrictions on discovery in § 2254 cases.  In *Pinholster*, the Court made clear that, "[a]lthough state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so." *Id*. at 1401.  The Court addressed the issues of "whether review under § 2254(d)(1) permits consideration of evidence introduced in an evidentiary hearing before the federal habeas court." *Id*. at 1398.  The Court held that when the state court has decided an issue on the merits, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id*.  Likewise, based on the plain language in the statute itself, review under § 2254(d)(2) is limited to "evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Pinholster*, 131 S. Ct. at 1400 n.7.

---

[1] If a petitioner has not been diligent in developing the factual basis of his claim in the state courts, he can obtain discovery only if he meets the stringent requirements of § 2254(e)(2)(A) and (B).

While *Pinholster* addressed evidentiary hearings in the district courts, courts have found that "its linkage to . . . discovery . . . is unquestionably present." *Coddington v. Cullen*, No. CIV S-01-1290 KJM GGH DP, 2011 WL 2118855, at *1 (E.D. Cal. May 27, 2011) (explaining that "the extent of permissible discovery in a habeas corpus action, seemingly once settled, has been upset by the AEDPA ruling of . . . *Pinholster*"). After *Pinholster*, if a state court decides a particular claim on the merits, district courts are not authorized to hold an evidentiary hearing in which new evidence is introduced to support that claim. It logically follows that conducting discovery on that claim would be futile:

> [A]ny new evidence unearthed during discovery in federal court and "later introduced in federal court is irrelevant to § 2254(d)(1) [and (2)] review." In other words, if the state trial court adjudicated . . . Petitioner's [claim] on the merits, such that Petitioner must satisfy the terms of § 2254(d), "good cause" does not exist for the discovery Petitioner seeks . . . because this Court may look only to the state court record in applying § 2254(d).

*Hurst v. Branker*, No. 1:10 CV 725, 2011 WL 2149470, at *8 (M.D.N.C. June 1, 2011) (quoting *Pinholster*, 131 S. Ct. at 1400)).

The Eleventh Circuit has not yet addressed the effect of *Pinholster* on § 2254 discovery claims. Because the Court resolves Lucas's discovery requests under Rule 6 and the diligence requirements discussed in *Isaacs* and *Crawford*, it does not reach the issue of whether *Pinholster* further limits discovery in § 2254 proceedings.

### III.   LUCAS'S SPECIFIC DISCOVERY REQUESTS

## A.     Discovery related the Georgia Department of Corrections' lethal injection procedures

Lucas claims that the method of execution that the Georgia Department of Corrections ("GDC") seeks to impose on him is unconstitutional because "the GDC's current lethal injection [p]rocedures lack readily available safeguards." (Pet'r Br. at 4, ECF No. 30). Specifically, Lucas asserts that Georgia's procedures do not: (1) provide that members of the intravenous injection team must be experienced professionals; (2) require the team to conduct practice sessions; (3) set limits on the number of times (or duration of time) the team can attempt to establish primary and back up intravenous injection access points; (4) direct the use of a backup intravenous injection if a problem arises; (5) "require that a nurse or physician administer a second set of lethal chemicals if a flat line is not observed." (Pet'r Br. at 5, ECF No. 30). According to Lucas, this results in an "intolerable risk of pain during execution," which violates his "Fifth, Sixth, Eighth, and Fourteenth Amendment rights." (Pet'r Br. at 4, 6, ECF No. 30).

Lucas also claims that "events that have transpired since the close of [his] state habeas proceedings have demonstrated that the GDC does not even consistently follow its own written [p]rocedures." (Pet'r Br. at 4-5, ECF No. 30). Lucas points to his co-defendant's attempted suicide, which, according to Lucas, "was made possible by the GDC's disregard for its written protocol." (Pet'r Br. at 8, ECF No. 30). Furthermore,

Lucas states that there has been "at least two botched executions"2 since his state habeas proceedings and that the GDC has executed at least two individuals using out-dated sodium thiopental that was obtained from Dream Pharma Ltd. "in violation of federal statutes and regulations."3  (Pet'r Br. at 6, 7, 9, ECF No. 30).  Following these two executions, the Drug Enforcement Administration seized the Dream Pharma sodium thiopental from the Georgia Diagnostic and Classifications Prison.  (Pet'r Br. at 9, ECF No. 30).

Lucas requests permission to discover (through interrogatories, document production requests, and depositions) information relating to the GDC's adoption of, and adherence to, its lethal injection procedures.  Lucas seeks to discover information relating to Georgia's prior execution practice, which allegedly involved the use of

---

2 Lucas refers to the 2007 execution of John Hightower and the 2008 execution of Curtis Osborne. (Pet'r Br. at 6, ECF No. 30).
3 Lucas refers to the 2010 execution of Brandon Rhode and the 2011 execution of Emmanuel Hammond.  (Pet'r Br. at 8, ECF No. 30).  Since 2001, Georgia has used a three-step lethal injection process for executions.  *See Baze v. Rees*, 553 U.S. 35, 42 n.1, 44 (2008).  Until recently, the Department of Corrections first administered sodium thiopental to prisoners in order to "induce a deep, comalike unconsciousness."  *Id.*  Thereafter, a second drug was injected to paralyze the inmate, followed by a third drug that induced cardiac arrest.  *Id.*  "The proper administration of the first drug ensure[d] that the prisoner [did] not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs."  *Id.*  Since confiscation of its supply of sodium thiopental, Georgia, as well as several other states, has started to use pentobarbital as the first drug in the three-step lethal injection process. *DeYoung v. Owens*, 646 F.3d 1319 (11th Cir. 2011); *Powell v. Thomas*, 641 F.3d 1255 (11th Cir. 2011).

"sodium thiopental that was illegally imported and of questionable efficacy." (Pet'r Br. at 9, ECF No. 30). He also seeks leave to discover information relating to the GDC's current execution practice and the GDC's alleged failure to follow its own adopted lethal injection procedures.

Lucas's request for discovery surrounding the GDC's use of "sodium thiopental that was illegally imported" attacks a moot point. (Pet'r Br. at 9, ECF No. 30). Lucas concedes that the questionable sodium thiopental was confiscated by the Drug Enforcement Administration. The GDC announced that it was substituting pentobarbital in the place of sodium thiopental for its lethal injection protocol. Bill Rankin, *Georgia's Death Row; New Drug OK=d for executions*, The Atlanta Journal-Constitution, May 21, 2011, at 1B. Therefore, this allegedly out-dated and illegally imported sodium thiopental will not be used to execute Lucas.

Additionally, Lucas's execution is not imminent, and given the developments regarding Georgia's lethal injection protocol in the last few months, it is likely that nobody knows with reasonable certainty what will happen if and when Lucas is executed. Thus, Lucas fails to show good cause to conduct discovery today on what may or may not happen at some indeterminate time in the future.

More importantly, Lucas's request to conduct discovery suffers from a more fundamental defect. A habeas action is not the appropriate vehicle for attacking Georgia's lethal injection procedures; rather, that challenge must be brought in a 42 U.S.C. § 1983 action. *Tompkins v. Sec'y Dep't Corr.*, 557 F.3d 1257, 1261 (11th Cir. 2009). Lucas is correct in asserting that the Supreme Court, in *Hill v. McDonough*, 547 U.S. 573 (2006), held that a § 1983 action is a viable means to challenge a lethal injection procedure. *Id.* at 579-83. The Supreme Court did not specifically hold that such a claim could never be brought in a habeas petition. However, the Eleventh Circuit has held that "§ 1983 and § 2254 are mutually exclusive," and if a claim can be brought under § 1983, it "cannot be brought under § 2254." *Thomas v. McDonough*, 228 F. App'x 931, 932 (11th Cir. 2007); *Hutcherson v. Riley*, 468 F.3d 750, 754 (11th Cir. 2006). In fact, in a recent decision, the Eleventh Circuit reiterated that "§ 1983 and § 2254 proceedings are 'mutually exclusive' so that if a claim can be properly raised in one of those proceedings it cannot be raised in the other type of proceeding." *Valle v. Sec'y, Fla. Dep't of Corr.*, No. 11-13962, 2011 WL 3925753, at *1 (11th Cir. Sept. 8, 2011). Because Lucas's claim regarding Georgia's lethal injection procedures can, pursuant to *Hill*, be brought under § 1983, it cannot be brought in a 28 U.S.C. § 2254 action. *See DeYoung v. Owens*, 646 F.3d 1319 (11th Cir. 2011) and *Powell v. Thomas*, 641 F.3d 1255 (11th Cir. 2011)(both 42 U.S.C. § 1983 actions in which the plaintiffs challenged their States' lethal injection procedures).

Lucas relies on *In re Schwab*, 506 F.3d 1369 (11th Cir. 2007) for the proposition that "a lethal injection challenge may be 'properly cognizable in an initial federal habeas petition'." (Pet'r Br. at 5, ECF No. 33). However, what the Court actually said in that case was "[e]**ven if** such a claim were properly cognizable in an initial federal habeas petition, instead of a 42 U.S.C. § 1983 proceedings, . . . [such a] claim cannot serve as a proper basis for a second . . . habeas petition." *Id*. at 1370 (emphasis added). Thus, the Court did not actually hold that such a challenge may be brought in a petitioner's first habeas action. In fact, the Court indicated, through citation of *Rutherford v. Mcdonough*, 466 F.3d 970 (11th Cir. 2006), that "circuit law requiring challenges to lethal injection procedures be brought in a § 2254 proceeding is 'no longer valid in light of the Supreme Court's *Hill* decision'." *Id*. at 1370. Since deciding *In re Schwab*, the Eleventh Circuit has clearly stated that § 2254 and § 1983 are mutually exclusive. *Thomas,* 228 F. App=x at 932; *Hutcherson,* 468 F.3d at 754; V*alle,* 2011 U. S. App. LEXIS 18644 at *1. Because a prisoner can bring a claim challenging lethal injections procedures in a § 1983 action, he cannot bring that same claim in his § 2254 proceedings. Therefore, the Court denies discovery regarding Georgia's lethal injection procedure.

**B. Discovery to support Lucas's claim that he was deprived access to mitigation evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments**

Lucas "seeks an opportunity to further develop evidence that his constitutional rights were violated when the trial court denied him access to mitigating evidence

concerning his co-defendant's history of mental illness." (Pet'r Br. at 2, ECF No. 30). Lucas requests leave to subpoena both Central State Hospital and New Orleans Adolescent Hospital 4 for their complete records on Brandon Rhode, Lucas's co-defendant. Lucas claims these records support his mitigation argument that "as between Mr. Lucas and Mr. Rhode, it is far more likely that Mr. Lucas followed Mr. Rhode's lead than vice versa." (Pet'r Br. at 14, ECF No. 30).

Lucas's trial attorneys made pretrial requests for Brandon Rhode's Central State Hospital records and his records from "an in-patient rehabilitation program in Louisiana." (Resp't Ex. 20 at 391). Apparently the State sought these records as well. (Resp't Ex. 20 at 391). Central State Hospital objected and the trial court conducted "an in camera, ex parte hearing with only the hospital represented." (Resp't Ex. 29 at 136). On September 13, 1999, the trial court entered an order, which provided "pursuant to O.C.G.A. § 37-7-166 (a)(7) that except for matters privileged under the law of the state, the records of Brandon Rhode be produced to the Court for an <u>in camera</u> inspection and subsequent possible release to defendant's attorneys for use at the trial of this case." (Res't Ex. 1 at 538). Apparently this order was directed to Central State Hospital alone

---

4 During the time between Brandon Rhode's arrest for murder and Lucas' trial, Rhode was hospitalized for several weeks at Central State Hospital. (Resp't Ex. 29 at 136) Rhode was apparently "hospitalized at a young age for psychiatric problems" at the New Orleans Adolescent Hospital. (Pet'r Br. at 13, ECF No. 30).

and there is no further mention of New Orleans Adolescent Hospital or the "in-patient rehabilitation program in Louisiana." (Resp't Ex. 20 at 391). Following entry of this order, the trial court explained in subsequent proceedings that it had gone through the submitted material and found "no exculpatory material" and had found "no material that . . . would be applicable in any mitigating situation." (Resp't Ex. 20 at 391).

Lucas argued on direct appeal that the Central State Hospital records were discoverable as mitigating evidence.5 (Resp't Ex. 29 at 135-42). Specifically, Lucas maintained that he, not the trial court, should have reviewed the records to determine "whether particular evidence is mitigating." (Resp't Ex. 29 at 139). The Georgia Supreme Court held as follows:

> The trial court, after conducting a thorough in camera review, refused to disclose the records of treatment received by Lucas's co-defendant during the co-defendant's incarceration. Lucas argues that the records were not prepared in the course of voluntary treatment and thus were not subject to the psychiatrist-patient privilege. However, because our review of the records indicates that they were prepared in the course of treatment, we conclude that the patient-psychiatrist privilege applied to them, regardless of whether that treatment was voluntary. A plurality of this Court has held that "in order to abrogate the psychiatrist-patient privilege, the [criminal] defendant must make a showing of necessity, that is, that the evidence in question is critical to his defense and that substantially similar evidence is not otherwise available to him." Applying that standard, we find that the trial court did not err in

---

5 Again, it does not appear that Lucas' attorneys made any further reference to, or arguments surrounding, the New Orleans Adolescent Hospital or the "in-patient rehabilitation program in Louisiana." (Resp't Ex. 1, p. 369).

> failing to disclose portions of the records that reflected psychiatrist-patient communications. Pretermitting the question of whether the trial court erred by failing to disclose any of the remaining portions of the records, we find beyond a reasonable doubt that their disclosure to Lucas would not have affected the outcome of either phase of the trial.

*Lucas*, 274 Ga. at 645 (citations omitted).

Next, Lucas filed a state habeas corpus action. (Resp't Ex. 40, 84). Apparently the record on appeal was unsealed. (Pet'r Br. at 7, ECF No. 33). According to Lucas, "the few pages that [Central State Hospital] apparently disclosed to the trial court . . . were mostly arrest reports and documents from the Jones County Jail. Only five pages actually pertained to Rhode's stay at [Central State Hospital]." (Pet'r Br. at 7, ECF No. 33). However, even after realizing that Central State Hospital disclosed so few records, Lucas never sought discovery of the additional records while his case was pending at the state habeas level. Lucas states that he did not pursue his claim regarding the hospital records because "it would likely have been barred by *res judicata*." (Pet'r Br. at 10, ECF No. 33). Certainly claims regarding the New Orleans Adolescent Hospital records were not barred by *res judicata* because the appellate court never addressed that particular issue. Additionally, the record reveals that Lucas raised numerous claims in the state habeas court that were "likely barred by *res judicata*." (Pet'r Br. at 10, ECF No. 33). In fact, Lucas's amended habeas petition contained nineteen total claims and the state habeas court found that five entire claims, as well as portions of seven additional claims,

were *res judicata*.  (Resp't Ex. 84, 177).  Nothing prevented Lucas from raising any claim, including his claim that the trial court erred in denying his access to Rhodes' Central State Hospital Records, during his habeas proceedings.  Certainly, when he realized that only five pages of records had been reviewed by the trial and appellate courts, nothing prevented him from seeking the remaining records.  In short, Lucas has not "explain[ed] why the discovery that he seeks now is any different from the discovery that was available to him in state courts."  *Isaacs*, 300 F.3d at 1250.  Because he did not exercise "sufficient diligence" at the state level, the Court denies his request for discovery.  *Id*.

The Court also notes that Respondent alleges Rhode's records from both Central State Hospital and the New Orleans Adolescent Hospital were introduced into evidence during Rhode's state habeas evidentiary hearing in June 2005; two years before Lucas's state evidentiary hearing.  Respondent states that these records have been a matter of public record since June 2005 and, therefore, formal discovery is not necessary to obtain the records.   Lucas counters that "just because Rhode filed *some* [Central State Hospital] and [New Orleans Adolescent Hospital] records does not mean that he filed *all* of them." (Pet'r Br. at 9, ECF No. 33).  Lucas states that "Rhode and his counsel may very well have omitted records that were not helpful to their position, and if so, the records he

omitted are most likely those that would be helpful to Mr. Lucas."  (Pet'r Br. at 9, ECF No. 33).

When Brandon Rhode filed his 28 U.S.C. § 2254 action in this Court, the respondent filed all of the exhibits that had been presented at Rhode's March 31, 2005 state habeas evidentiary hearing in the Butts County Superior Court.  *See Rhode v. Hall*, 5:07-CV-248 (CAR) (M.D. Ga.).  Respondent's Exhibit 49 in the federal habeas action (which was Petitioner's Exhibit 17 at the state habeas evidentiary hearing) is 328 pages of hospital records from the New Orleans Adolescent Hospital. The first 186 pages of Respondent's Exhibit 50 in the federal habeas action (which was Petitioner's Exhibit 18 at the state habeas evidentiary hearing) are Rhode's records from Central State Hospital. *See Rhode v. Hall*, 5:07-CV-248 (CAR) (M.D. Ga.).

During the state habeas evidentiary hearing, the respondent submitted some "excerpts" from both Central State Hospital and the New Orleans Adolescent Hospital. These too are part of the Rhode's federal habeas action.  *See* Respondent's Exhibits 66 (which contains Respondent's Exhibits 8 and 9 from the state habeas evidentiary hearing) *in Rhode v. Hall*, 5:07-CV-248 (CAR) (M.D. Ga.).  One would assume that if Rhode failed to include records that were harmful to him, these are the "excerpts" that respondent tendered during the state habeas evidentiary hearing because they would have been helpful to his case.   Therefore, it appears that most, if not all, of the hospital

records Lucas seeks are a matter of public record and available to him without a subpoena.

## IV.  CONCLUSION

Based on the above, the Court **DENIES** Lucas's Motion for Leave to Conduct Limited Discovery.

**SO ORDERED**, this 28th day of September, 2011.

                                            S/   C. Ashley Royal
                                            C. ASHLEY ROYAL, JUDGE
                                            UNITED STATES DISTRICT COURT