IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

DANIEL ANTHONY LUCAS,           :
                                :
                Petitioner,     :
                                :
        vs.                     :
                                :   CIVIL ACTION NO. 5:09-CV-289 (CAR)
STEPHEN UPTON, Warden,          :
                                :
                Respondent.     :
                                :
_____ :

## ORDER

Petitioner **DANIEL ANTHONY LUCAS**, an inmate on death row at the Georgia

Diagnostic and Classification State Prison in Jackson, Georgia, petitions the Court for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254.   For reasons discussed below, his

petition is denied.

## I.  BACKGROUND AND PROCEDURAL HISTORY

### A.  Facts

The following findings of fact were set forth by the Georgia Supreme Court in

connection with Lucas's direct appeal:

> The evidence adduced at trial, which included Lucas's videotaped
> confession to investigators and testimony regarding his inculpatory
> statement to a friend, showed the following.   Lucas and Brandon Joseph
> Rhode burglarized the home of Steven and Gerri Ann Moss twice on April
> 23, 1998.   During the second burglary of the Moss home, 11-year-old
> Bryan Moss returned home from school.   Lucas and Rhode confronted
> Bryan and forced him to sit in a chair, and then Lucas fired at Bryan with a
> .25 caliber handgun, inflicting a non-fatal wound to his upper arm and
> shoulder.   Lucas led Bryan to a bedroom where he shot the boy repeatedly

1

with the .25 caliber handgun. In the meantime, Rhode met 15-year-old Kristin Moss as she arrived from school, placed her in a chair, and shot her twice with a .357 caliber handgun. Rhode then shot Steven Moss four times with the .357 caliber handgun as Steven arrived home. Finally, Lucas obtained a .22 caliber handgun from Rhode's automobile and shot Bryan and Kristin Moss both again. Both Bryan and Kristin as well as their father Steven Moss died as a result of any number of these gunshot wounds inflicted by Lucas.

Several witnesses observed Rhode's automobile as Lucas and Rhode fled in it from the Mosses' home. One of these witnesses identified Lucas as the passenger in the automobile. A search of the automobile revealed a recently-used spare tire and damage to both the front and rear bumpers. The damage to the bumpers was shown to be consistent with damage to a propane tank and a cinder block at the Mosses' home. Expert testimony demonstrated that paint left on the cinder block matched the paint on Rhode's automobile. Further expert testimony showed that an impression left in the Mosses' dirt driveway could have been made by the spare tire.

*Lucas v. State*, 274 Ga. 640, 641, 555 S.E.2d 440, 443-44 (2001).

**B. Procedural History**

The crimes were committed on April 23, 1998. *Id*. at 640 n.1, 555 S.E.2d at 443 n.1. On September 16, 1999, Lucas was found guilty and convicted of three counts of malice murder, two counts of burglary, and one count of kidnaping with bodily injury. *Id*. One day later, "[t]he jury fixed Lucas's sentences for each of the murders at death" and the trial court imposed three death sentences for the three murders in conformity with the jury's sentencing verdicts. *Id*

Lucas's motion for a new trial, which he amended twice, was denied on February 15, 2001. *Id*.

Lucas filed a notice of appeal and his conviction and sentence were affirmed by

the Georgia Supreme Court on November 19, 2001.   *Id*. at 652, 555 S.E.2d at 451.   The

Georgia Supreme Court denied Lucas's motion for reconsideration on December 14,

2001.   (Doc. 56-1).[1].   The Supreme Court of the United States denied certiorari on

October 7, 2002 and denied a petition for rehearing on December 2, 2002.   *Lucas v.*

*Georgia*, 537 U.S. 840 (2002), *Lucas v. Georgia*, 537 U.S. 1068 (2002).

      Lucas filed a Petition for Writ of Habeas Corpus in the Superior Court of Butts

County, Georgia on August 13, 2003.   (Doc. 56-7).   On July 9-11, 2007, the state habeas

court held an evidentiary hearing.   (Doc. 57-23 to Doc. 57-28).   In an order dated June

20, 2008, the Superior Court of Butts County denied relief.   (Doc. 65-10).   On August 19,

2008, Lucas filed an Application for Certificate of Probable Cause to Appeal with the

Supreme Court of Georgia, which was denied on June 29, 2009.   (Doc. 65-12; Doc.

65-16).   Lucas filed a Motion for Reconsideration, which the Georgia Supreme Court

denied on July 28, 2009.   (Doc. 65-17; Doc. 65-18).   The Supreme Court of the United

States denied certiorari on March 1, 2010.   (Doc. 31-4).

      On August 20, 2009, Lucas filed in this Court a Petition for Writ of Habeas Corpus

by a Person in State Custody, which he amended on November 30, 2009.   (Doc. 1; Doc.

18).   Respondent filed his Answer on September 11, 2009 and answered the amended

petition on December 28, 2009.   (Doc. 5; Doc. 19).   Pursuant to the Court's October 6,

---

[1]  Because all documents have been electronically filed, this Order cites to the record by using the
document number and electronic screen page number shown at the top of each page by the
Court's CM/ECF software.

2009 Scheduling Order, both parties have now briefed all issues.   (Doc. 11).

## II. STANDARD OF REVIEW

Lucas filed his federal habeas corpus petition after enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").   Pursuant to 28 U.S.C. § 2254(d), habeas relief cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's decision was (1) "was contrary to . . . clearly established Federal law"; or (2) "involved an unreasonable application of clearly established Federal law" or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[2]   28 U.S.C. § 2254(d)(1)-(2).   The phrase "clearly established Federal law" used in § 2254(d)(1) refers to the holdings, not the dicta, of the United States Supreme Court in existence at the time of the relevant state court decision.   *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"'The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are separate bases for reviewing a state court's decisions.'"   *Fotopoulous v Sec'y, Dep't of Corr.*, 516 F.3d 1229, 1232 (11th Cir. 2008) (quoting *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001)).   A state court's decision is "contrary to" clearly established law if it contradicts the governing law set forth in the Supreme Court's case or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and

---

[2]  A district court's review under § 2254(d)(1)-(2) "is limited to the record that was before the state court that adjudicated the claim on the merits."   *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

nevertheless arrives at a different result.  *Williams*, 529 U.S. at 405-06; *Michael v. Crosby*, 430 F.3d 1310, 1319 (11th Cir. 2005)  "A state court's decision that applies the law as determined by the Supreme Court to the facts is not 'contrary to' whether or not the federal court would have reached a different result."  *Carr v. Schofield*, 364 F.3d 1246, 1250 (11th Cir. 2004) (citing *Fugate v. Head*, 261 F.3d 1206, 1216 (11th Cir. 2001)).

A state court's decision involves an "unreasonable application" of federal law when "'the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case, or when it unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context.'"  *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011)).  An "unreasonable application" and an "incorrect application" are not the same:

> "Indeed, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable.  This distinction creates a substantially higher threshold for obtaining relief than de novo review. AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt."

*Hill v. Humphrey*, 662 F.3d 1335, 1344-45 (11th Cir. 2011) (quoting *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010)).

"To obtain habeas relief 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there

was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Reese*, 675 F.3d at 1286 (quoting *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011)).  The "unreasonable application" inquiry requires this Court to "'determine what arguments or theories supported or, [if none were stated], could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court].'"  *Id*. at 1286-87 (quoting *Richter*, 131 S. Ct. at 786).

The only other basis for the grant of habeas relief occurs when the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  "[A] determination of a factual issue made by a State court shall be presumed to be correct. The [habeas petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  The Eleventh Circuit has explained that a federal court's "'review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review.'"  *Reese*, 675 F.3d at 1287 (quoting *Stephens v. Hall*, 407 F.3d 1195, 1201 (11th Cir. 2005)).  A state court's "determination of the facts is unreasonable only if no 'fairminded jurist' could agree with the states court's determination."  *Holsey v. Warden*, 694 F.3d 1230, 1257 (11th Cir. 2011).

Lucas alleges that this Court should not give the AEDPA deference to the state habeas court's decision because it is a verbatim adoption of the proposed order authored by Respondent's counsel.   (Doc. 50 at 22 n.3).   The United States Supreme Court and the Eleventh Circuit have criticized this practice.   *See Jefferson v. Upton*, 130 S. Ct. 2217, 2223 (2010); *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 (11th Cir. 1997). However, the Supreme Court has stated that while it is not the preferred practice for a court to adopt the prevailing side's facts verbatim, such "findings are those of the court and may be reversed only if clearly erroneous."   *Anderson v. Bessemer City*, 470 U.S. 564, 572 (1985) (citations omitted).   Moreover, the Eleventh Circuit has "consistently upheld the use of such orders as long as they were adopted after adequate evidentiary proceedings and are fully supported by the evidence."   *Brownlee v. Haley*, 306 F.3d 1043, 1067 n.19 (11th Cir. 2002).   In *Rhode v. Hall*, 582 F.3d 1273 (11th Cir. 2009), Lucas's codefendant complained that the state habeas court adopted verbatim the Respondent's proposed order.   *Id.* at 1281-82.   The Eleventh Circuit explained that "[d]espite the fact that the state habeas court adopted the State's facts verbatim, these findings of fact are still entitled to deference from this court unless [the petitioner] can show the facts to be clearly erroneous."   *Id.* at 1282.

### III. LUCAS'S CLAIMS

#### A.  Ineffective Assistance of Counsel

*Strickland*[3] remains "the touchstone for all ineffective assistance of counsel claims" and at all points judicial scrutiny of counsel's performance must be highly deferential.  *Blankenship v. Hall*, 542 F.3d 1253, 1272 (11th Cir. 2008).  To obtain relief, Lucas must meet both the deficient performance and prejudice prongs of *Strickland*.  To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  The Court "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."  *Richter*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689).  "To overcome that presumption, [Lucas] must show that counsel failed to act 'reasonabl[y] considering all the circumstances.'"  *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 689).

To establish prejudice, Lucas must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different."  *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.  "The likelihood of a different result must be substantial, not just conceivable."  *Richter*, 131 S. Ct. at 792.  Because Lucas contends that but for his trial counsel's errors, he would not have received a

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

sentence of death, the Court must "consider 'whether there is a reasonable probability that, absent the errors, the sentencer–including an appellate court, to the extent it independently reweighs the evidence–would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) (quoting *Strickland*, 466 U.S. at 695).   When determining if prejudice exists, the Court must consider all the relevant evidence that the jury would have had before it if trial counsel had pursued a different path, not just the mitigation evidence, but also any aggravating evidence that may have come in with it.   *Wong v. Belmontes*, 558 U.S. 15, 20 (2009); *Porter v. McCollum*, 558 U.S. 30, 41-42 (2009).

This Court's review of Lucas's ineffective assistance claims is "doubly deferential."   *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420 (2009).   "Because the Georgia courts have already rejected these ineffective assistance claims, [Lucas] must show that their decision to deny relief on those claims was an objectively unreasonable application of the *Strickland* standard."   *Hammond v. Hall*, 586 F.3d 1289, 1324 (11th Cir. 2009) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

Lucas makes two ineffectiveness claims.   First, he maintains trial counsel failed to investigate, develop, and present an effective attack on his videotaped confession either before or during trial.   Next, he contends trial counsel failed to develop and present mitigating evidence about his abusive childhood during the sentencing phase.

1. Videotaped Confession

On April 26, 1998, Lucas gave a videotaped confession.   (Doc. 54-3).   He stated that he took six Xanax prior to burglarizing the Moss residence.   (Doc. 54-3 at 4).   He explained that during this first burglary, he and Rhode stole a few items, including a gun.   (Doc. 54-3 at 5, 34-35).   According to Lucas, they left the Moss residence, went to Rhode's house, and then, at an unknown time, decided to return to the Moss residence. (Doc. 54-3 at 5, 12, 15-16).   Lucas explained that he was not sure why they returned to the same home they had already burglarized.   (Doc. 54-3 at 5).   He stated that after they broke into the Moss residence the second time, the little boy[4] arrived home and Rhode told him to come in and sit down in a chair in the living room.   (Doc. 54-3 at 5-6, 17-18).   Lucas explained that after the little boy sat down, he shot him, but did not kill him.   (Doc. 54-3 at 6, 20).   When Rhode told Lucas that the girl was coming home, Lucas made the little boy go into a bedroom.   (Doc. 54-3 at 6, 19-20).   Lucas explained that while he was in the bedroom with the boy, he heard the girl enter the home, ask where her little brother was, and then he heard Rhode shoot her.   (Doc. 54-3 at 6, 22-23, 33).   Lucas stated that he heard Rhode say that the man was coming home, after which he heard the man "holler" and then heard Rhode shoot him.   (Doc. 54-3 at 6, 23). According to Lucas, at some point in time, either while Rhode was shooting the girl and the man or shortly thereafter, Lucas killed the little boy by shooting him repeatedly an

---

[4] In his confession, Lucas refers to Bryan Moss as "the boy" or "the little boy"; Kristen Moss as "the girl"; and Steven Moss as "the man."

unknown number of times.   (Doc. 54-3 at 6, 25, 28).   At some point, Lucas went to Rhode's car to retrieve another gun, which he used to shoot the girl two more times. (Doc. 54-3 at 7-8, 30-31).   Lucas stated that he could not remember if he shot the boy any more times with the gun he retrieved from Rhode's car.   (Doc. 54-3 at 31).   He explained that during the crimes, he knew what was happening, but he was dazed and could not think.   (Doc. 54-3 at 27).   Lucas stated that he "knew it was wrong"; he was "sorry about doing it"; and he had "no reason for it or no explanation why it happened." (Doc. 54-3 at 41).

Lucas's trial counsel[5] filed a motion to suppress his confession. They maintained that Lucas's confession was involuntary and unreliable because:   (1) officers threatened Lucas by telling him he would go to the electric chair and "fry" for the murders; (2) officers promised him he could avoid the death penalty by confessing; (3) officers illegally used Lucas's girlfriend to convince him to confess; (4) Lucas suffers from below-average intellectual functioning and a history of drug abuse, both of which made him vulnerable to police coercion and suggestion during the lengthy interrogation; and (5) Lucas was just repeating what the officers and Rhode told him because he had no indepdent memory of the events due to the drugs and alcohol he consumed on the day

---

[5]  Lucas was represented by Brian Gregory Combs, D. James Jordan, and Patrick J. Keenan. (Doc. 57-23 at 65; Doc. 57-24 at 13-14, 61-62).   Combs was lead counsel, had been practicing law approximately fourteen years, and had handled one previous death penalty case.   (Doc. 57-23 at 65-67).   Jordan, as an associate, had researched the issues and interviewed witnesses in two previous death penalty cases.   (Doc. 57-24 at 15, 25).   Keenan had worked with the Southern Center for Human Rights in Atlanta for approximately three years.   (Doc. 57-24 at 96).

of the murders.   (Doc. 58-20 at 16-17).

On July 9, 1999, the trial court conducted a pretrial hearing regarding the motion to suppress.   Testimony during this hearing revealed that on April 25, 1998, two days after the murders, Rhode was brought to the Jones County Sheriff's Department for questioning.   (Doc. 54-1 at 84, 86).   After Rhode told the officers that he was with Lucas on the day of the murders, officers brought Lucas to the Jones County Sheriff's Department to verify Rhode's whereabouts.   (Doc. 54-1 at 84-85).   At approximately 7:16 pm, Captain Earl M. Humphries and Officer David Simmons told Lucas they wished to speak with him regarding the "Moss murder investigation," advised him of his *Miranda*[6] rights, and had him execute a waiver.   (Doc. 54-1 at 86-87; Doc. 54-2 at 127).   Humphries and Simmons questioned him for approximately one hour and Lucas denied any involvement.   (Doc. 54-1 at 96-97, 100-02).

After approximately one hour, Humphries and Simmons took a break.   (Doc. 54-1 at 100-02).   As they exited the interview room, they asked Lucas if he needed anything and he responded that he did not.   (Doc. 54-1 at 100).    During the break, they learned Rhode had implicated Lucas in the murders.   (Doc. 54-1 at 101-02).   Specifically, Rhode told investigators that Lucas used his car the day of the murders, showed him a black .357 caliber revolver, and told him that he had broken in the Moss residence and shot some people.   Rhode stated his only involvement was helping Lucas

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

get rid of some of the property he had stolen.   (Doc. 54-1 at 102).

Humphries and Simmons returned to the interview room and asked Lucas if he had anything to add to the information that he had given them previously.   (Doc. 54-1 at 104).   When they confronted Lucas with the information that Rhode had provided, Lucas just looked at them in disbelief.   (Doc. 54-1 at 103-04).   Lucas then denied shooting anyone or possessing a firearm.   (Doc. 54-1 at 103-04).

After approximately thirty or forty-five minutes, Humphries and Simmons took another break.   (Doc. 54-1 at 105)   During this break, the officers interviewed two other individuals who explained that Rhode and Lucas were together at Rhode's house on the day the murders, had abruptly left together, and were gone for approximately thirty minutes.   (Doc. 54-1 at 107).   Humphries and Simmons also learned that Rhode was escorting investigators to the dump site where he and Lucas discarded the property stolen from the Moss residence.   (Doc. 54-1 at 105-08).

After approximately thirty minutes, Humphries and Simmons rejoined Lucas, explained to him that Rhode was taking the investigators to recover the stolen property, and informed him that Rhode maintained Lucas was solely responsible for the murders. (Doc. 54-1 at 107-08).   Lucas did not verbally respond but did "tear up."   (Doc. 54-1 at 108).   When the investigators who had accompanied Rhode to the dump site returned, Lucas was shown the three guns that they recovered.   (Doc. 54-1 at 109-115). Humphries testified that this was "a tactic which was meant to implore Mr. Lucas to tell

his side of the story." (Doc. 54-1 at 111). Humphries stated that the guns and several Polaroid photographs of the crime scene were shown to Lucas to reinforce the fact that Rhode was providing a lot of information regarding the murders and was making Lucas "out to be the monster." (Doc. 54-1 at 112, 115). According to Humphries, he told Lucas that Rhode was "going to be the main witness against" him and "end up putting [him] in the electric chair" if Lucas failed to tell his "side of the story and try to spread the blame around—all the way around." (Doc. 54-1 at 112). Lucas responded that he did not know what to do. (Doc. 54-1 at 113).

Lucas requested to see his girlfriend. (Doc. 54-1 at 117). Humphries and Simmons left the room and allowed him to speak with his girlfriend for approximately five minutes. (Doc. 54-1 at 118-20). When Humphries and Simmons re-entered the interrogation room, Lucas told them that he wanted to go to sleep. (Doc. 54-1 at 120). It was approximately midnight when Lucas was escorted to a jail cell to sleep. (Doc. 54-1 at 120).

The following day, Simmons retrieved Lucas from his jail cell at approximately 11:00 am. (Doc. 54-2 at 31). Lucas was offered food, something to drink, and allowed to smoke a cigarette. (Doc. 54-2 at 36). Simmons read Lucas his *Miranda* rights again and informed Lucas that neither he, nor anyone else, could promise him anything but they wished to speak with him again about the murders. (Doc. 54-2 at 32-35, 77). Lucas said he was willing to answer some questions. (Doc. 54-2 at 35). When

Simmons informed Lucas that Rhode had given a videotaped confession, Lucas asked to view the tape and he was allowed to do so.   (Doc. 54-2 at 39-40, 77).   After viewing the tape, Lucas stated that it was "bullshit" and he agreed to "tell his side of the story." (Doc. 54-2 at 48).   Lucas was *Mirandized* again on the video and he acknowledged that he had not been threatened or promised anything in exchange for his statement.   (Doc. 54-3 at 3).

After hearing this testimony, viewing Lucas's videotaped confession, and allowing the parties to brief the issues, the trial court denied Lucas's motion to suppress. (Doc. 53-6 at 81).   On direct appeal to the Supreme Court of Georgia, Lucas claimed this was error and he argued that his confession was involuntary, inherently unreliable, and should not have been admitted.   (Doc. 55-29 at 102).   Along with other arguments, he claimed, that "his consumption of drugs and alcohol made it impossible for him to form a memory of the events at issue."   (Doc. 55-29 at 115).   The Georgia Supreme Court held:

> Upon our review of the record, we conclude that the trial court did not err in finding that Lucas's videotaped confession was voluntarily made after he had been advised of and had waived his right under Miranda v. Arizona.   We also conclude that the trial court did not err in concluding that the confession was not induced by "the slightest hope of benefit or remotest fear of injury," despite the comments made to him by law enforcement officers.

*Lucas*, 274 Ga. at 644, 555 S.E.2d at 445-46 (footnotes omitted).

Before the state habeas court, Lucas argued, as he does now, that trial counsel

were ineffective because they failed to develop and present expert testimony from Dr. Anthony Y. Stringer, a neuropsychologist, and Dr. Randall Tackett, a pharmacology expert, to support their argument that Lucas's level of intoxication on the day of the murders rendered his confession unreliable.

At the state habeas evidentiary hearing, Stringer testified that he was hired by trial counsel in March 1999 to conduct a neuropsychological examination of Lucas. (Doc. 57-26 at 113-14).   He explained that trial counsel requested he evaluate Lucas's "susceptibility to suggestion from others and his memory and behavior, his ability to form memories and his vulnerability to being led by others." (Doc. 57-26 at 115).   He stated that trial counsel provided him with numerous school, employment, and mental health records, which he reviewed before examining Lucas in April 1999.   (Doc. 57-26 at 115).   Stringer testified that when he evaluated Lucas, he learned of Lucas's "horrific family circumstances," his "extensive drug abuse," and "the fact that he had . . . a number of incidents where he had suffered blows to the head."   (Doc. 57-26 at 117-18). Stringer stated that he and his technician administered a number of standard neuropsychological tests and determined that Lucas, who has an upper-end average range IQ of 110, suffers from "left hemisphere brain dysfunction," likely caused by the head injuries he sustained.   (Doc. 57-26 at 129-30, 136).   He stated that individuals with this type of brain dysfunction "remember[] information in less detail."   (Doc. 57-26 at 133).   Stringer testified that Lucas, due to this disorder, may have gaps in his memory

and might "take information that someone has provided him . . . as being accurate. (Doc. 57-26 at 134).   He stated that he reviewed Lucas's videotaped confssion in 2002 and, had he seen it in 1999, he could have testified that the statement had a lot of "gaps with regards to any detail" and "it seemed to be very much responsive to the information that was being presented to him."   (Doc. 57-27 at 5).   He explained that his "overall neuropsychological opinion of Mr. Lucas" had not changed since he spoke with trial counsel in 1999 and that he was not called to testify at the suppression hearing or Lucas's trial.   (Doc 57-26 at 137; Doc. 57-27 at 1, 6).

Tackett also testified at the state habeas evidentiary hearing.   He explained that trial counsel first contacted him in September 1998 and asked him to assess the effects of drugs and alcohol on Lucas.   (Doc. 57-26 at 55, 63-65).   He stated that trial counsel provided him information regarding Lucas's drug use and that he interviewed Lucas prior to trial in order to learn his family history.   (Doc. 57-26 at 67-69).   Tackett explained that he learned several people in Lucas's family had substance abuse problems and that Lucas had a history of drug abuse, which included "everything from cocaine, alcohol, mushrooms, LSD, [and] prescription drugs."   (Doc. 57-26 at 69). According to Tackett, Lucas could not remember much of what happened inside the Moss residence on the day of the murders.   (Doc. 57-26 at 70).   Tackett stated he informed trial counsel that he "felt strongly that [Lucas] had experienced a blackout or blackouts during the day of the crime."   (Doc. 57-26 at 71).   Tackett explained he

based this opinion on Lucas's history of drug abuse, his history of frequent blackouts, and the combinations of drugs Lucas ingested on the day of the murders.   Doc. 57-27 at 73).   He also testified that Lucas, because of his blackouts, was susceptible to suggestibility, which meant that when Lucas could not recall information about the events of the day, he accepted the explanation suggested by someone else.   (Doc. 57-26 at 78).   Tackett opined that the combination of drugs that Lucas consumed on the day of the murders "made it impossible for Mr. Lucas to understand events as they occurred, much less remember any details later.   In short, his consumption of drugs and alcohol made it impossible for him to form a memory of the events at issue."   (Doc. 57-26 at 79-80).   However, on cross examination Tackett acknowledged that he had no way of knowing the exact amount of drugs Lucas consumed on the day of the murders.   (Doc. 57-26 at 90-91).   He also explained on cross examination that it was not his opinion Lucas had no memory of the crimes, just that there were periods of time that Lucas could not recall.   (Doc. 57-26 at 93).   Tackett stated that he disagreed with Dr. John Robert Cusask, another of Lucas's experts, who found that Lucas was not in a blackout the day of the murders.   (Doc. 57-26 at 96).   Finally, Tackett opined that "Lucas's alcohol and drug use was not voluntary."   (Doc. 57-26 at 99).   He explained that the first time a person uses a drug or alcohol, it is a voluntary choice.   After that, however, the person is addicted to the drug, their "brain chemistry" is changed, and that becomes the "driving force" behind the consumption of the drug.   Thus, they are not "voluntarily"

abusing drugs and alcohol.   (Doc. 57-26 at 99-101).   Tackett explained that he informed

trial counsel of these findings and opinions but they did not call him to testify at the

suppression hearing or at trial.   (Doc. 57-26 at 66, 86).

After hearing this testimony and having the parties brief the issue, the state

habeas court denied relief.   Citing *Strickland*, the court found:

> [T]he evidence presented in this case does not support Petitioner's
> allegation that trial counsel did not develop and present an attack on his
> videotaped statement, which Petitioner claims was involuntary and not
> reliable.   The record establishes that trial counsel challenged each aspect
> of the interrogations and did attempt to argue that the confession was
> unreliable because of Petitioner's intoxication on the day of the murders.
> Although Petitioner's actual intoxication on the day of the murders would
> not have directly affected Petitioner's voluntariness of the confession, trial
> counsel pursued a theory that Petitioner was unable to form a memory of
> the events of the crime because of his intoxication on the day of the
> murder[s] and that because of a mental defect Petitioner was more
> susceptible to coercion.   Petitioner's own statement was played for the
> trial judge during the suppression hearing, which mentions an excess of six
> Xanax pills that Petitioner ingested before going to the Moss home and
> Petitioner's statement that, "I know what was happening, but I was just like
> dazed and can't think."
>
> The record shows that trial counsel also hired Dr. Randall Tackett, a
> pharmacological assistance (sic).   Trial counsel testified that they
> consulted with Dr. Tackett as a significant issue at trial was Petitioner's
> ingestion of drugs at the time of the crime.   Dr. Tackett was able to
> provide information as to the drugs that were involved in the case, the
> interactions between the drugs and the effects on Petitioner, the effects of
> drugs and alcohol on a person's behavior, and the interactions of
> combinations of drugs and alcohol.
>
> Mr. Keenan provided Dr. Tackett with a detailed memorandum of
> Petitioner's history of drug use and newspaper articles regarding the
> crime.   Mr. Keenan spoke with Dr. Tackett regarding his findings in
> Petitioner's case.   Dr. Tackett opined that Petitioner was in a black out at

the time of the crime, and he was unable to form intent to commit murder. He also stated that there were gaps in Petitioner's memory of the crime, which could have been caused by the combination of the drugs that he consumed around the time of the crime.   He never opined and was never informed by Petitioner that Petitioner did not commit the crimes.

Trial counsel also obtained the services of Dr. Anthony Stringer, a neuropsychologist who specialized in treating patients who had abused drugs or alcohol and who had suffered head injuries.   Trial counsel requested that Dr. Stringer administer tests to assess Petitioner's "susceptibility to suggestion from others in his memory and behavior, ability to form memories, vulnerability to being led by others."   Trial counsel provided Dr. Stringer the school, employment and mental health records of Petitioner and information regarding the crime and autopsy reports, and requested that Dr. Stringer contact them if he needed any additional information.   Dr. Stringer performed his neuropsychological examination and obtained a detailed history of Petitioner's background.

Dr. Stringer concluded that Petitioner showed a "pattern of performance suggestive of left hemisphere brain dysfunction."   As a result, Petitioner's "[p]roblem solving ability is marred by severe impulsivity" and his memory of verbal information was faulty.

This Court finds that Petitioner has never denied involvement in the case, and has never told anyone, in the past or present, that his confession is untrue.   The Court notes Petitioner's various statements made to others, as well as his statement to law enforcement, show that Petitioner does have memory of the crimes, including shooting Bryan Moss.   Petitioner made statements to his Uncle Brad Lucas and Derrick Jackson prior to talking to police saying that he "messed up real bad"and "killed somebody."   During his conversation with Robbie Hunnicutt on the afternoon of the murders, Petitioner stated that "he was killing those motherfuckers."   Derrick Jackson also testified that Petitioner confessed on the day of the murders, "I shot somebody."   These confessions to others are in addition to Petitioner's video-taped confession, which all undermine Petitioner's claim that law enforcement "fed" Petitioner information and also undermines Petitioner's experts' findings that Petitioner was in a blackout, without memory, of the crimes.

The Court also notes that Petitioner reviewed Mr. Rhode's videotaped

statement implicating Petitioner as the sole perpetrator of the murders just prior to Petitioner stating "that's bullshit" and making his statement. If Petitioner's statement was "Rhode's story, not [Petitioner]'s" as suggested by Petitioner, Petitioner would have claimed responsibility for all three murders or, as Mr. Rhode stated to law enforcement on the Sunday morning when Petitioner made his statement, that Mr. Rhode shot Kristin at the behest of Petitioner and that Petitioner shot and killed both Steven and Bryan Moss.

Following the suppression hearing, the trial court denied Petitioner's motion. Trial counsel argued on direct appeal that "the combination of drugs and alcohol [Petitioner] consumed made it impossible for Mr. Lucas to understand events as they occurred, much less remember any details later." Additionally, trial counsel argued in the same brief that "the facts of Mr. Lucas's interrogation, his condition at the time of the offense, and the discrepancies between the physical evidence and the scenario presented by the state ... showed that [Petitioner]'s statement is inherently unreliable and should have been suppressed." Subsequently, the claim was decided adversely to Petitioner by the Georgia Supreme Court.

This Court finds that Petitioner failed to prove any resulting prejudice from the performance of trial or appellate counsel as Petitioner failed to show that there was any reasonable probability that, if Dr. Tackett and/or Dr. Stringer had testified at the suppression hearing, the trial court would have suppressed Petitioner's confession and the outcome of trial would have been different.

(Doc. 65-10 at 13-16).

Lucas argues that the state habeas court failed to consider the "totality of the circumstances" when reaching this decision. (Doc. 50 at 46). According to Lucas, the state habeas court's ruling involved an unreasonable application of clearly established federal law because, when finding that counsel were not ineffective in failing to suppress the confession, it failed to even mention, let alone analyze, other factors, i.e., Lucas's age, the length of the interrogation, law officers' threats of execution, the promise of benefit

for confessing, and the interrogators' provision of all of the facts to Lucas.   (Doc. 52 at 18, 30).

The state habeas court correctly identified *Strickland* as the legal standard and stated that it had reviewed all of the evidence presented by Lucas.   (Doc. 65-10 at 1, 11). The court specifically mentioned evidence presented at the suppression hearing and trial, such as:   (1) Lucas's statement that he ingested six Xanax on the day of the crimes; (2) his statement that he was "dazed" and unable to think during the crimes; (3) that he confessed to others prior to giving his statement to the police; and (4) the fact that Lucas did not adopt Rhode's statement as his own.   The state habeas court also examined the arguments made on direct appeal and acknowledged that the Georgia Supreme Court found Lucas's confession was voluntary and should not have been suppressed.   The court considered the evidence presented at the state habeas corpus evidentiary hearing and found that there was not "a reasonable probability that, but for counsel's unprofessional errors," which allegedly were their failure to present testimony from Tackett and/or Stringer, "the result of the proceeding would have been different." (Doc. 65-10 at 1, 11); *Strickland*, 466 U.S. at 687.   This Court cannot find that this ruling involves an unreasonable application of *Strickland*.

To the extent that Lucas argues the state habeas court should have more adequately recited the factors it considered when reaching this decision, the Eleventh Circuit recently reiterated that allegations a state habeas court "failed to say enough"

and should have "provided a detailed explanation" cannot prevail.  "This approach 'smacks of a "grading papers" approach that is outmoded in the post-AEDPA era.'" *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1329 (11th Cir. 2012) (quoting *Wright v. Sec'y for the Dep't of Corr.*, 278 F.3d 1245, 1255 (11th Cir. 2002)).

Lucas contends that "[t]he state court's decision was . . . based on an unreasonable determination of the facts" because it "found that counsel had challenged the interrogation and attempted to argue that the videotaped statement was unreliable because of Mr. Lucas's intoxication, but that finding misses the point."   (Doc. 50 at 47). The Court fails to see how this was an unreasonable finding of fact as it was just the starting point of the state habeas court's analysis.   Both at the suppression hearing and on direct appeal, counsel did challenge the interrogation and did maintain that the videotaped statement was unreliable due to Lucas's intoxication.   (Doc. 58-20 at 78-79; Doc. 55-29 at 114-15).   This Court realizes, just as the state habeas court did, that Lucas's claim is that trial counsel did not **adequately** investigate and **adequately** present evidence to support the motion to suppress.   The state habeas court simply disagreed with this argument.   Although this Court might reach a different result on de novo review, fairminded jurists might agree with the correctness of the state court's decision. *Holsey*, 694 F.3d at 1257.   Thus, the Court must deny relief.

Lucas also argues that counsel were ineffective because they failed to use "an expert in police interrogation and coerced confessions."   (Doc. 50 at 33).   At the state

habeas corpus evidentiary hearing, counsel tendered Dr. Richard Ofshe as an "expert in psychology of police interrogations and coerced confessions."   (Doc. 57-27 at 21).   The Respondent objected to his testimony regarding coerced confessions because such was not "recognized . . . in the State of Georgia at this time."   (Doc. 57-27 at 21).   The state habeas court found that he could testify to police procedure but would not allow him to testify that Lucas's confession was coerced.   (Doc. 57-27 at 23).   Ofshe stated that he was hired by state habeas counsel, had reviewed many records in the case, but had not spoken with Lucas.   (Doc. 57-27 at 30).   Ofshe provided a lengthy explanation of "how an interrogation works in general and what elements are present."   (Doc. 57-27 at 31-59).   State habeas counsel then made an offer of proof:   Ofshe opined that Lucas's confession was not voluntary; "there were threats of harm to Mr. Lucas if he did not confess"; and investigators told Lucas the facts of the case.   (Doc. 57-27 at 67).   Ofshe testified that in his professional opinion, Lucas's confession was "the product of the use of psychological coercion and that it fails to corroborate his independent knowledge of the details of the crime."   (Doc. 57-27 at 111).

The state habeas court found:

> [T]he Court finds that trial counsel were not deficient and Petitioner was not prejudiced by trial counsel not attempting to present testimony such as that offered by Petitioner through Richard Ofshe to "explain[] how modern police interrogation works and the psychological pressures that can be applied."   This Court ruled during the evidentiary hearing that Mr. Ofshe's testimony was not allowed insofar as it applied any particular standards to explain Petitioner's statement.   This Court notes that the Georgia Supreme Court recently upheld a trial court's ruling to prohibit the

testimony of Richard Ofshe as "not sufficiently developed to satisfy the evidentiary test for criminal cases set forth in <u>Harper</u>, 249 Ga. 519 1982)." <u>Lyons v. State</u>, 282 Ga. 588 (2007).   Moreover, in <u>Riley</u>, a 2004 death penalty case, the Georgia Supreme Court ruled that the trial court did not err in limiting testimony concerning false confession theory.   The Court found that the theory "relies almost exclusively on anecdotal evidence" and has not reached a "verifiable stage of scientific certainty." <u>Riley v. State</u>, 278 Ga. 677, 682-684 (2004).   [Petitioner] failed to show that trial counsel were deficient or Petitioner was prejudiced by . . . trial counsel not offering this type of testimony as there is no evidence that this type of testimony was admissible in 1999.

(Doc. 65-10 at 16-17).

Lucas has failed to show that this ruling was unreasonable factually or that it involved an unreasonable application of *Strickland*.

Lucas alleges that in addition to their pretrial errors; trial counsel were ineffective when they failed to challenge Lucas's confession during his trial.   According to Lucas, they should have sought to undermine the confession by emphasizing its deficiencies, which would have created residual doubt in the minds of the jurors regarding what really happened inside the Moss home on the day of the murders.   Lucas alleges that the state habeas court unreasonably found that trial counsel's decisions about the confession were "strategic" and "made after a thorough investigation."   (Doc. 50 at 52). However, the record supports these findings.   Trial counsel's investigation into the State's case and possible defenses included reviewing all of the State's files, the physical evidence, and both Lucas's and Rhode's confessions.   Trial counsel deposed Humphries and another investigator, Scott Reese, in an attempt to determine if Lucas had been

coerced into confession.    They spoke with Lucas on numerous occasions and his version of the crimes closely resembled what he stated in his confession.    Trial counsel hired a social worker as well as an investigator and interviewed numerous witnesses, family members, and friends.    Trial counsel obtained numerous school, medical, and psychological records.   (Doc. 57-23 at 71-73, 97-104; Doc. 65-10 at 17-20).   They also had Lucas evaluated by Stringer and Tackett.   (Doc. 57-26 at 55, 115).   In addition to these two experts, they retained Cusack, "an expert in Psychiatry with a special expertise in the effects of drugs and alcohol."   (Doc. 55-1 at 11).   He evaluated Lucas to determine what effects the drugs and alcohol had on Lucas on the day of the murders.

Following this investigation and the trial court's denial of their motion to suppress, trial counsel knew Lucas's confession was "going to be heard by the jury and, therefore, [they] had to accept that reality and work around that."   (Doc. 57-23 at 81). The state habeas court found as follows regarding trial counsel's handling of Lucas's statement during the trial:

> Following the denial of the Motion to Suppress, trial counsel testified that their entire guilt phase strategy changed in that they made the decision to embrace the confession as they believed that if they challenged the investigation that it would send the "wrong signal to the jury as to why we were there and what we were hoping they were going to do for us."   Trial counsel further testified that they could not present evidence to the jury that they knew would be completely contradicted by the State's evidence. Trial counsel further stated that they would have lost credibility with the jury if they had presented argument that Petitioner's confession was coerced, that Petitioner was not present during the crime, and that Mr. Rhode was completely responsible for the murders.

Following the realization that Petitioner's videotaped statement would be admitted into evidence at trial, counsel reasonably concluded that Petitioner would likely receive a guilty verdict due to the believability of the confession.   Trial counsel testified that Petitioner's case then became a mitigation case wherein their job was to save Petitioner's life, and they used the guilt phase of the trial to try and set up mitigation.   As such, trial counsel presented a multi-faceted mitigation strategy beginning in the guilt phase of trial, including the introduction of: potentially mitigating evidence, including expert testimony, during the guilt phase of the trial, evidence of remorse or some acceptance of responsibility for the murders by Petitioner, and the presentation of argument that law enforcement would not have solved the crime had it not been for Petitioner's cooperation.   All three trial attorneys agreed on this multi-faceted strategy for the guilt phase as they were cognizant of the fact that they had to "win the jury's credibility."

Trial counsel also determined to attempt to portray Mr. Rhode as the major player and worst actor, and that Petitioner was only involved in one of the three murders.   Trial counsel testified that they wanted to ensure that the jury appreciated Mr. Rhode's participation in the crime as the evidence clearly showed that Mr. Rhode had murdered Steven and Kristin Moss. Furthermore, trial counsel wanted to portray Petitioner as a person who did not have a violent past and "who got caught up in this horrible thing." . . .

Trial counsel also thoroughly investigated Petitioner's drug use on the day of the crime and presented that evidence during the guilt phase of the trial. They also argued that the crime would never have occurred but for Petitioner's intoxication. . . .

Trial counsel determined to call Dr. Cusack during the guilt phase of Petitioner's trial.   Trial counsel wanted to show the jury that Petitioner had used alcohol and drugs which affected his state of mind and memory of the crime.   In presenting that testimony, trial counsel stated that they wanted to "put the best face we could on the statements that were made and suggest that they may not even be accurate to a large extent."   Trial counsel further stated that there was evidence that Petitioner had consumed a large amount of alcohol and drugs, however, they were aware that this finding was a "double edged sword" as they knew voluntary intoxication is not a legal defense and it is not very mitigating.   Trial

counsel wanted to make the jury aware of that the "drug use" aspect of the case as it meant that Petitioner's memory may be unreliable as to the statement that Petitioner gave to the police and perhaps make Petitioner's confession appear unreliable to the jury.

Dr. Cusack testified that Petitioner started using alcohol and drugs around the age of twelve, and it continued throughout his teenage years at an escalating pace. Petitioner's drug use included hallucinogens, methamphetamines, cocaine, marijuana and large amounts of tequila and vodka. Dr. Cusack also testified that Petitioner's intoxication on the day of the crime resulted in impairment to his memory, concentration, judgment, impulsivity, insight and orientation. He stated that on the day of the crime Petitioner had consumed marijuana, eight to ten Xanax, and an unknown quantity of Darvocet and cheap red wine. He explained that the use of these drugs could have resulted in unsteadiness of gait, slurred speech, blurred vision, inattention to memory and coma.

In conclusion, Dr. Cusack stated that the drugs consumed by Petitioner gravely affected him. He stated that Petitioner had a history of black-outs; however, it did not appear from the videotaped statement that Petitioner was in a full black out. Dr. Cusack noted that there were "islands of clarity or lucidity" and "sea of haze of not knowing anything." He further stated that Petitioner's recollection, reasoning and impulsivity were eroded and almost destroyed, so far that he would have been unable to logically plan out his thoughts . . . .

In closing argument, trial counsel argued that Petitioner was not a cold-blooded killer, that he was cognitively impaired on the day of the murders, Petitioner was remorseful, and that Petitioner did not have requisite intent to commit malice murder.

This Court finds that trial counsel's investigation was not deficient and that Petitioner has failed to show any prejudice by trial counsel's investigation. The Court further finds that trial counsel's strategic decisions, as to what evidence and witnesses to present, were made after a thorough investigation. Therefore, Petitioner has failed to show that trial counsel's presentation of evidence or trial counsel's closing arguments, which was based on the evidence presented, were deficient or that Petitioner was prejudiced.

(Doc. 65-10 at 17-23).

Lucas alleges that the state habeas court unreasonably found that "trial counsel embraced the statement in part because they were trying to argue that the investigators would not have solved the crime without Mr. Lucas's cooperation."   (Doc. 50 at 50). The record shows this finding was reasonable.   In the state habeas evidentiary hearing, Combs stated that once they knew Lucas's statement would be allowed into evidence, they used it to try and show that Lucas, as opposed to Rhode, was cooperative.   (Doc. 57-23 at 111).   Jordan acknowledged that they did not come right out and make the argument, but they hoped to "plant" the thought in the jurors' minds that the authorities might not have solved the case if Lucas did not give his statement.   (Doc. 57-24 at 29-30). He explained that once they knew the statement was going to be admitted, they knew

> that . . . the objective was to save [Lucas's] life.   And so the best way
> that we thought to do that was to, first of all, make sure that the
> jurors could appreciate . . . the co-defendant's . . . participation, the
> fact that the evidence was clear that he killed Mr. Moss and killed
> the daughter and that we were telling the jury that . . . [Lucas's]
> confession . . . was what happened in the case and that without [his]
> confession . . . , law enforcement would never have known how this
> crime occurred.

(Doc. 57-24 at 21-22).

Lucas maintains that trial counsel fully embraced his confession when they conceded in opening remarks that Lucas's words represented the truth about the crimes. (Doc. 50 at 51).   Thus, according to Lucas, the state habeas court unreasonably found

trial counsel suggested that Lucas's confession might not be accurate.   (Doc. 50 at 51).

The record, however, supports the state habeas court's finding.   Jordan explained in his

opening statement that Lucas's videotaped confession contained "to the best of his

knowledge" the truth of what occurred at the Moss residence.   (Doc. 54-20 at 53).

Again, Jordan emphasized that Lucas "was going to tell you as—as best he could

remember."   (Doc. 54-20 at 53).   Jordan also explained that there are "gaps" in his

statement because Lucas took a large quantity of Xanax and Darvocet and consumed

alcohol on the day of the murders.   (Doc. 54-20 at 53-54).   In his closing, Jordan stressed

that Lucas was extremely intoxicated on the day of the crimes and that "we are never

going to know the sequence of events" due to Lucas's poor recollection of events.   (Doc.

55-1 at 111).

Lucas also alleges that the state habeas court unreasonably found that trial

counsel decided to concede the truth of the statements so that they could argue the act of

confessing showed Lucas's remorse and acceptance of responsibility.   (Doc. 52 at 20).

According to Lucas, trial counsel never made that argument.   The record shows

otherwise.   Both Jordan and Combs argued that Lucas "knows what he did and he has

shown remorse."   (Doc. 55-5 at 52, 60-61).

After reviewing the record, this Court finds that the state habeas court's decision

that trial counsel were not ineffective in their handling of Lucas's confession, both

pretrial and during trial, was not based on any unreasonable determinations of fact and

did not involve an unreasonable application of *Strickland*.

   2.   Investigation and Presentation of Mitigation Evidence

   The state habeas court found that trial counsel's investigation into mitigating

evidence was "thorough and extensive":

> Trial counsel stated that "the day we started trying this case we were looking for mitigation."   Investigator Smith spoke to "scores and scores of witnesses and people who . . . had affected [Lucas's] life in any way."

> During their investigation into mitigation evidence, trial counsel obtained numerous records on Petitioner and his family.   Specifically, trial counsel stated that they sought to obtain "whatever institutional type records, or any records that existed.". . .

> In addition, the defense team investigated and obtained the criminal histories on various witnesses. . . .

> The defense team also spoke with Petitioner's family, friends, girlfriends and teachers in hopes of obtaining mitigation evidence.   Specifically, trial counsel sought any information about Petitioner's background that would be helpful in obtaining some sympathy from the jury and in presenting Petitioner to the jury.

> Investigator Smith's summaries show the extensive investigation that the defense team conducted in investigating: strategies for Petitioner's case, Petitioner's actions leading up to the crime and prior to his arrest, Petitioner's background, Petitioner's characteristics, Petitioner's dysfunctional family and their backgrounds, (including physical, verbal and substance abuse), Petitioner's drug use and drug sales, whether Petitioner was a leader, Petitioner's prior crimes, his association with the Moss family, his interaction with his peers, Petitioner's negative influence on others, his relationship with Megan Hood, and Petitioner's admissions and confession to the crime.

> The record also shows that in addition to Drs. Stringer, Tackett, and Cusack, trial counsel also consulted with a number of other potential experts, including: a crime scene expert, a death penalty jury consultant,

and a social work expert who had limited involvement.

Additionally, prior to jury selection, trial counsel participated in a focus group in Morgan County, to "test" their mitigation theories.   As evidenced by the notes prepared by Mr. Combs, trial counsel presented the following theories:   Petitioner's drug induced state of mind at the time of the crime; Petitioner was affected by four generations of drug and alcohol abuse and at least three generations of family violence; Petitioner was neglected, rejected and abandoned by caregivers; Brandon Rhode was the leader and career burglar; the murder of Bryan Moss was not the type of murder that would give rise to the statutory aggravating circumstance of vile, wanton or inhuman, involving torture or depravity of mind; Petitioner would adapt well to prison; and Petitioner was a good and sweet child who was loved by many of his relatives.

Trial counsel also investigated the background of Petitioner's co-defendant, Brandon Rhode, to determine the roles of each defendant, and as they wanted "to know enough to make him the bad guy."   The record establishes that the defense team questioned a multitude of witnesses about Mr. Rhode's background as part of [their] investigation to attempt to support their defense theory that Mr. Rhode was the leader and more culpable in the murders of the Moss family.   The defense investigator traveled to Louisiana to try and locate people that had grown up with Mr. Rhode.   The investigation of Mr. Rhode's background uncovered the fact that Mr. Rhode had instigated other home invasion burglaries with other young people while he was living in Louisiana.

Trial counsel were also aware of the rumors in the community that the Moss family was possibly involved in drug activity.   As such, trial counsel investigated the theory that the crime was possibly drug related, and they investigated the possibility that Gerri Moss might have had some connection with either Mr. Rhode or Petitioner.   Trial counsel ultimately concluded that most of the rumors were false.

(Doc. 65-10 at 23-27) (citations omitted).

The record supports these factual findings.   Ultimately, the state habeas court

held that Lucas did not show trial counsel's investigation was deficient or that he was

prejudiced by their investigation.   Lucas has not shown that these findings involved an unreasonable application of *Strickland* or that any of the state habeas court's factual findings were unreasonable.   In fact, Lucas even concedes that his trial counsel's investigation into his life history was reasonable.   (Doc. 52 at 23).   What Lucas contends is that trial counsel failed to adequately present the mitigation evidence that their investigation uncovered.

As discussed above, once they knew Lucas's confession would be admitted into evidence, trial counsel realized their focus had to be on mitigation.   (Doc. 57-23 at 81, 112).   Combs testified that, "unfortunately, almost every witness . . . was a Hobson's choice" and that there "were both good aspects, from the standpoint of . . . mitigation, and there were things that were not so good."   (Doc. 57-23 at 85).   Trial counsel realized that Lucas's history of drug use was a "Catch-22" and that his use of drugs and alcohol on the day of the crimes was a "double edged sword."   (Doc. 57-23 at 82, 86).   Also, while there was evidence of family violence, Combs stated that "there was no evidence of direct . . . abuse on [Lucas] by elders or parents, or anything."   (Doc. 57-23 at 86).   Jordan explained that Lucas's "life to that point may not have been . . . the best" but, "nothing was so horrible as to really be able to latch on to, that you felt was going to make a difference."   (Doc. 57-24 at 30-31).   Ultimately, trial counsel's mitigation strategy involved portraying Rhode as the primary actor; emphasizing Lucas's remorse; showing a family history of drug and alcohol abuse; gaining sympathy for Lucas

through the "people that did love him"; demonstrating that Lucas was a "redeemable human being" who had never been violent and had committed only minor criminal offenses in the past; and showing that he would be an ideal nonviolent prisoner.   (Doc. 55-2 at 57; Doc. 57-23 at 85-87; Doc 59-19 at 64-65).

      a.   Mitigation evidence presented at trial

Trial counsel began developing the mitigation evidence during the guilt phase of the trial.   (Doc. 57-23 at 112).   They presented the testimony of   Cusask, "an expert in Psychiatry with a special expertise in the effects of drugs and alcohol."   (Doc. 55-1 at 11).   He testified that Lucas "started heavily abusing illicit substances and alcohol in late childhood . . . about age 12 . . . and then . . . throughout the teenage years at an escalating pace."   (Doc. 55-1 at 14-15).   He explained the effects of Xanax, Darvocet and alcohol, all of which Lucas consumed on the day of the murders.   (Doc. 55-1 at 13, 18-19).   He opined that Lucas's "recollection or reasoning, his impulsivity, everything was eroded, almost destroyed" on the days of the murders and that "his judgment . . . was significantly marred."   (Doc. 55-1 at 25, 39).   He stated that he did "not think this murder would have occurred if it wasn't for the substances this . . . young man took." (Doc. 55-1 at 43).

During the mitigation phase, trial counsel called witnesses to show that Rhode, not Lucas, was the "major actor" or leader.   First, they called Humphries who testified that after his arrest, Rhode successfully escaped from the Jones County Jail.   (Doc. 55-4

at 61-63).   Next, Martha Parman, a detention office jail supervisor with the Putnam County Sheriff's Office, testified that, as part of a second escape attempt, Rhode assisted another inmate who physically attacked her.   (Doc. 55-4 at 68-69).   She explained that Rhode was subsequently convicted of mutiny and criminal attempt to escape.   (Doc. 55-4 at 69).

Keith Sitton, a Special Agent with the Georgia Bureau of Investigation, testified that Rhode underwent a polygraph examination following the murders.   (Doc. 55-4 at 78).   Sitton explained that he asked Rhode:   "Did you shoot the girl?   Did you shoot the boy?   Did you shoot the father"?   (Doc 55-4 at 81).   According to Sitton, Rhode's negative responses to each question showed deception, with the strongest deception shown in response to the question regarding "the girl."   (Doc. 55-4 at 82-83).

Bryan Keith Hyde, Jr., testified that when he was fourteen and attending school with Rhode in Louisiana, Rhode talked him into burglarizing a home.   (Doc. 55-4 at 96-97).   He explained that the burglary was Rhode's idea and that, prior to that incident, Hyde had never burglarized a home and had never been arrested. (Doc. 55-4 at 97). Hyde testified that Rhode told him what to steal when they were inside the home and that Rhode stole several guns during the burglary.   (Doc. 55-4 at 98).   Hyde stated that they placed all of the stolen property in the woods, except for one gun that Rhode kept to take to the three additional burglaries that they committed that day.   (Doc. 55-4 at 98-99, 101).   Finally, Hyde testified that at Rhode's urging, they stole a van.   (Doc. 55-4 at 99).

By cross examining Derrick Jackson, one of the State's witnesses, trial counsel established that Rhode "had been involved in virtually dozens of burglaries" around the time of the murders.   (Doc. 55-2 at 155).   Jackson stated that Lucas, on the other hand, had been involved in "no more than three."   (Doc. 55-2 at 156).   According to Jackson, Lucas committed only a few burglaries immediately before the day of the murders, unlike Rhode who "had been doing them months and months before."   (Doc. 55-2 at 157).

Also on cross examination, Jackson testified that Lucas drank alcohol and started using marijuana, mushrooms, and angel dust at a young age.   He explained that Lucas's family abused drugs and drank alcohol.   (Doc. 55-2 at 158-60).   The jury also learned from Jackson that Lucas was homeless at the time of the murders.   According to Jackson, Lucas was living at the Courtesy Court Motel because he had nowhere else to live.   (Doc. 55-2 at 159).   Jackson testified that Lucas's "mother had kicked him out and his father just . . . never seemed to care.   I mean, never."   (Doc. 55-2 at 160).   Jackson explained that Lucas talked to him "all the time" about feeling neglected and abandoned by his family.   (Doc. 55-2 at 160).   He told the jury that Lucas "always felt like – he felt nobody wanted him."   (Doc. 55-2 at 160).

Trial counsel called Lucas's aunt, Kelly Bowden.   She explained that there was a long history of substance abuse in their family.   She testified that Lucas's maternal great grandfather was a violent man who had drug and alcohol problems.   (Doc. 55-4 at

106-07).   She explained that Lucas's maternal grandmother (her mother) had always abused both drug and alcohol.   (Doc. 55-4 at 107-08).   She testified that she, her brother, and Lucas's mother (Debra) were placed in foster care because drug and alcohol abuse rendered their mother unable to care for them.   When they were returned to the home, their mother's drug and alcohol abuse continued.   (Doc. 55-4 at 107).   Debra, who was eight years older than Bowden, had to assume the role of the mother and cook and clean for the family because her mother was on drugs and "most of the time, she was out of it." (Doc. 55-4 at 108).   Bowden explained that her father (Lucas's maternal grandfather) was in prison while his children were growing up.   (Doc. 55-4 at 108).   Bowden told the jury that her mother was, at the time of Lucas's trial, still addicted to drugs and alcohol. (Doc. 55-4 at 108).

According to Bowden, she and Debra began using drugs and alcohol at a young age.   (Doc. 55-4 at 108-09).   At the age of eighteen, Debra became pregnant with Lucas and after Lucas's birth, his father (David) and Debra drank alcohol excessively, smoked marijuana, used crack, and took methamphetamines.   (Doc. 55-4 at 109-10).   Bowden testified that this substance abuse occurred when Lucas was present in the house and went on "for a long time throughout [Lucas's] early childhood."   (Doc. 55-4 at 110). She stated substance abuse made it impossible for David and Debra to care for Lucas and his younger sister (Lacey).   (Doc. 55-4 at 110-13).   She explained that Lucas's paternal grandparents would often take the children to their home to care for them

"because there was a lot of partying going on" at Debra and David's house.   (Doc. 55-4 at 110).   Bowden testified that in addition to abusing drugs in the children's presence, Lucas's parents often fought in front of him and Lacey.   (Doc. 55-4 at 112).   Bowden concluded by saying that Lucas had been a sweet and loving child and she asked the jury not to impose the death penalty.

Lacey Lucas, who was fourteen at the time of trial, testified that Lucas protected her when their parents fought.   (Doc. 55-4 at 117).   She explained that he would comfort her and cover her ears so that she would not hear their mother and father argue.   (Doc. 55-4 at 117).   She stated that Daniel was protective of her and that she loved him.   (Doc. 55-4 at 117-18).   She apologized for the murders and asked the jury to spare his life.   (Doc. 55-4 at 118-19).

Fay Lucas, Lucas's paternal grandmother, testified that David, Lucas's own father, had not been present one day at Lucas's trial.   (Doc. 55-4 at 121).   She stated that she spent a lot of time with Daniel when he was young and that he was more like a child to her than a grandchild.   (Doc. 55-4 at 122, 124).   She described him as a "marvelous child" who was sweet and well-behaved.   (Doc. 55-4 at 122).   She testified that he was a gifted artist who still sent her pictures and wrote her often.   (Doc. 55-4 at 123).   Mrs. Lucas explained that she visited her grandson often in jail; she knew he was remorseful for the crimes he had committed; and she pled with the jury to spare his life.   (Doc. 55-4 at 123-24).

Charles Lucas, Lucas's paternal grandfather, testified that Lucas was a good child who liked to pay baseball, swim, go the movies, and collect baseball cards.   (Doc. 55-4 at 125-26).   He stated that he loved Daniel and sees him every week on visiting day.   He begged the jury not to impose the death penalty.   (Doc. 55-4 at 126).

Reverend John Miller Brown, the pastor at Debra's church, testified that he had visited Lucas in jail approximately six times.   (Doc. 55-4 at 130-31).   He stated that Lucas was "[v]ery remorseful and is feeling a lot of pain for what he's done."   (Doc. 55-4 at 131).   He stated that it was "most assuredly" his opinion that Lucas was truly remorseful.   (Doc. 55-4 at 132).

James Evans Aiken, an expert in corrections and classifications, testified that he had reviewed Lucas's records from both the Jones County and Baldwin County jails and that he had spoken to jail staff.   (Doc. 55-4 at 146).   He explained that the staff described Lucas as a person who "stays out of trouble," "stays to himself" and "avoids trouble makers."   (Doc. 55-4 at 150).   According to Aiken, jail staff stated that Lucas had been a model prisoner "for an extended period of time" and they opined that "[i]f we had everybody like Mr. Lucas, we wouldn't be running up and down these hallways all of the time."   (Doc. 55-4 at 150).   Aiken testified that Lucas could be safely confined in a maximum security facility for the remainder of his life without presenting harm to staff, other inmates, or the community.   (Doc. 55-4 at 151).   He stated that inmates serving life without parole are not more violent than other inmates because they are

"adequately managed in a correctional environment."   (Doc. 55-4 at 159).

Aiken testified that he spoke with Lucas's family to learn about the environment in which he grew up.   (Doc. 55-4 at 154).   He explained that during his lengthy professional career he had interviewed "many people," seen "many lives that ha[d] been destroyed due to family dysfunction," and had "heard some heartbreak stories," but "[t]his case and this family history [would] always remain with [him] as long as [he] live[d]."   (Doc. 55-4 at 154-55).   When questioned why, he stated:

> Why?   You don't just say, "There's a family with substance abuse.
> There's a family with sexual abuse.   There's a family of alcohol abuse.
> You know, there's a family of object (sic) poverty.   There's a family that
> has no structure.   There's a family where the mother is beaten up.
> There's a family that a father is an alcoholic."   All of these things are true
> in this case, and I'm not belittling them.   I'm sure we have family
> members that we are not very proud of, but this is unique from the
> standpoint that it goes from generation to generation.   It goes from the
> mother to the mother to the son.   A family setting where you've got a kid
> that's coming home from school and he doesn't know what he's going to
> meet.   Is it going to be a boyfriend that's beating up the mother. . . .

(Doc. 55-4 at 155).

The State objected to any further family background testimony from Aiken.   (Doc. 55-4 at 155).   The trial court ruled that Aiken was going "outside the bounds of the qualification" and sustained the objection.   (Doc. 55-4 at 156).

Trial counsel questioned Aiken why the chaotic environment in which Lucas grew up mattered.   Aiken explained

> As a Warden of a prison, you have to realize that people just didn't grow
> up or decide all of a sudden one day to violate the law.   There has to be a

logical succession.   And in this case, you had abuse, like I've just shared with you.   But the thing that's so unique about it and why it ties in and why it's so important to my decision making is how did Mr. Lucas deal with it?   How did he deal with this in school?   Looking at his school record, I didn't find anywhere where he beat up teachers.   I didn't find anywhere where he beat up other students.   I didn't find anywhere that he set the school on fire.   Dealing with the family domestic situation, I did not find that he came in with a weapon and started shooting up the boyfriends that were beating up his mother.   I didn't find any incidents of violence, no arrest record where he was violent in a domestic situation or in the community, for that matter.

(Doc. 55-4 at 156-57).

During their closing arguments, trial counsel explained to the jury that Lucas had a "tough life" but had managed to overcome these limitations until certain individuals, such as Rhode, entered his life.   (Doc. 55-5 at 51).   Jordan stated that Lucas had cried and was very remorseful while Combs explained that Lucas had tried to commit suicide following the crimes, "knows what he did and . . . has shown remorse."   (Doc. 55-5 at 52, 60).   Combs stated that Rhode was the "more dangerous" of the two and that, unlike Lucas, crime had been "a way of life" for Rhode for many years.   (Doc. 55-5 at 57). Trial counsel reminded the jury that Lucas's family loved him very much and that he did not have a violent past.   (Doc. 55-5 at 57-58, 62).   Combs explained that Lacey and Lucas's grandparents were heartbroken and suffering a loss.   (Doc 55-5 at 67).   He implored the jury to "watch over them, too."   (Doc. 55-5 at 67).   Combs stressed that, unlike Rhode who escaped jail in the past, Lucas would be a model prisoner.   (Doc. 55-5 at 59-60).   They also reminded the jury that Lucas was young, a teenager who was in a

"highly intoxicated state," when the crimes occurred.   (Doc. 55-5 at 61-62).

      b.   Mitigation   evidence   presented   during   state   post-conviction proceedings

At the state habeas evidentiary hearing almost eight years later, counsel presented testimony of several experts.[7]   Ralph Robert Tressel, an expert in forensic investigation, explained that he had reviewed the GBI investigative files, Jones County Sheriff's Department records, autopsy reports for the three victims, crime scene photographs, autopsy photographs, crime scene videos, Rhode's and Lucas's confessions, and GBI laboratory reports pertaining to the processing of the evidence. (Doc. 57-26 at 13).   He concluded that there was "no forensic evidence recovered at the scene linking . . . Lucas to the crime scene" and that the crimes could have been committed by just one individual.   (Doc. 57-26 at 14).   He explained that Lucas's fingerprints were not found on the guns, blood spatter was not found on the socks that Lucas supposedly wore on his hands, and neither blood spatter nor gun residue was found on Lucas's clothes.   (Doc. 57-26 at 20, 27).   On cross examination he acknowledged that fingerprints would not be found on the guns if Lucas, as he stated in his videotaped confession, was wearing socks on his hands and that no one could definitively say what clothing Lucas was wearing the day of the crimes.   (Doc. 57-26 at

---

[7]  As explained previously, Stringer, Tackett, and Ofshe testified at the state habeas corpus evidentiary hearing.   Most of their testimony addressed the reliability of Lucas's confession and this Court summarized their testimony on pages 16 to 19 of this Order.

39)   Finally, he acceded that Lucas's confession was "very consistent with the wounds each victim had."   (Doc. 57-26 at 40).

Debra Radcliff, Lucas's mother, testified that her mother had a "problem with addiction" but was "a very good, sweet lady" with "a heart of gold," who raised her three children by herself and "worked very hard."   (Doc. 57-28 at 3).   While she heard that her father was abusive to her mother, she did not have any memory of the abuse because her mother left her father when she was six months old.   (Doc. 57-28 at 4).   She testified that she and her sibling were removed from their home because of her mother's drug abuse and inability to care for them.   (Doc. 57-28 at 6).   When they were returned to the home, Debra had to care for her younger siblings because her mother started abusing pain medication.   (Doc. 57-28 at 5).   Debra testified that her mother abused drugs throughout her life and actually died in 2005 of an accidental overdose.   (Doc. 57-28 at 6).   Debra explained that she started using drugs at age fourteen and became pregnant at seventeen.   (Doc. 57-28 at 8).   She stated that she and Lucas's father, David, abused alcohol and smoked marijuana and crystal meth while Lucas and Lacey were present in the home.   She explained, "[W]hen we did our drugs we would go in the bedroom and do the drugs and come out."   (Doc. 57-28 at 11).   Debra testified that she smoked marijuana with Lucas when he was older.   (Doc. 57-28 at 22).   She admitted that she neglected her children.   According to Debra, David did not hit Lucas "physically hard" but he did once whip Lucas "with a belt on his butt and left bruises"

because Lucas, who was in the fourth grade at the time, left school without telling anyone and they were "worried sick about him."   (Doc. 57-28 at 12-13).   She testified that for financial reasons they once lived in three different residences during the school year, forcing Lucas to attend three different schools.   (Doc. 57-28 at 13).   Debra stated that after David learned of her affair with another man, they had numerous fights.   She explained that they tried to reconcile on several occasions, but were unable to do so.   According to Debra, during the last of these reconciliation attempts, David attempted to strangle her and he broke her finger.   (Doc. 57-28 at 15-16).

Debra testified that after leaving David, she lived with Bruce Ammons.   She explained that Ammons once chased her, Lucas, and Lacey with a gun and, when they managed to get into a car, he broke the car window.   (Doc. 57-28 at 18).   She testified that on another occasion, Ammons raped her and threatened to kill her.   She did not pursue charges against Ammons.   (Doc. 57-28 at 20-21).

Debra explained that following their divorce, David married Ginger Ruth Lucas and at times Lucas lived with his father and Ginger.   According to Debra, Ginger mistreated Lucas by not letting him take a shower and making him "sleep somewhere really weird."   (Doc. 57-28 at 20).

Debra explained that after she left Ammons, she married Danny Newton.   She testified that Lucas moved in with them and was, at first, doing well "because he was on probation" but later started using drugs, arguing, and fighting with her.   (Doc. 57-28 at

21-22).   She explained that they "fought a lot" and some of their arguments escalated into big fights.   (Doc. 57-28 at 23).   Debra stated that she did not want Lucas bringing drugs into their home around his younger sister.   (Doc. 57-28 at 22).   She testified that approximately three months before the murder, one of their arguments escalated into a fight and Newton kicked Lucas out of their house.   (Doc. 57-28 at 23).

On cross examination, she explained that she met with Lucas's trial counsel and investigators on numerous occasions and explained her family history, drug use, David's drugs use, and Lucas's relationship with Ginger.   (Doc. 57-28 at 25-26).   She also admitted that during some of these meetings, she called Lucas "spoiled" and "nagging."   (Doc. 57-28 at 26).   Debra also acknowledged that immediately before Newton kicked Lucas out of their house, Lucas told her that "if it wasn't against the law, sometimes he wished that he could kill [her]."   (Doc. 57-28 at 27).

Lacey Lucas testified again.   She described her mother's abusive relationship with Ammons but stated that Lucas lived with his father during this time period.   (Doc. 57-28 at 34).   She explained that when Lucas moved in with Debra and Newton, her mother nagged him and yelled at him.   She stated that one time her mother called Lucas "a piece of shit."   (Doc. 57-28 at 37).   She testified that Ginger, who was crazy, did not like Lucas, made him set up his bedroom in the bathroom of the house, made him do chores that she did not make her own two sons perform, and behaved in a sexually suggestive manner with Lucas and other boys.   (Doc. 57-28 at 38-39).

James Louis Pelt, Lucas's cousin, testified that he often visited Lucas when Lucas lived with David and Ginger.   (Doc. 57-28 at 43).   He explained that he enjoyed the visits because "there wasn't (sic) very many rules and we pretty much did what we wanted over there."   (Doc. 57-28 at 44).   He recalled that both he and Lucas saw David and Ginger fight and, on one occasion, "David beat Ginger up pretty bad."   (Doc. 57-28 at 44).   He testified that both he and Lucas witnessed David fight Debra and one of her boyfriends.   According to Pelt, Debra's boyfriend pointed a pistol at David but David managed to take the gun from him and beat him with the gun.   (Doc. 57-28 at 45).   He testified that Ginger was crazy and "always tried to grab the guys' penises and stuff, whoever was around the house."   (Doc. 57-28 at 46).   Pelt admitted on cross examination that Ginger's behavior did not keep him from frequently visiting their house.   (Doc. 57-28 at 55).   He explained that Ginger "treated [Lucas] pretty unfair," called him "sorry," and showed favoritism toward her own children.   (Doc. 57-28 at 46). He said that Lucas was abusing crank, cocaine, and acid during his teen years and that Lucas smoked marijuana with his mother.   (Doc. 57-28 at 47-48).   Pelt stated he did speak with Lucas's trial counsel in 1999 and told them that Lucas was "typically a leader in his group of friends" or someone they "all looked up to."   (Doc. 57-28 at 53-54).

Nancy Smith, a mitigation investigator previously employed at the Southern Center for Human Rights, testified that in late 1998 or early 1999, trial counsel had her investigate Lucas's case.   (Doc. 57-28 at 64).   Smith explained that her job was to

interview potential witnesses for both the guilt/innocence and penalty phases of the trial. (Doc. 57-28 at 65).   Smith stated that trial counsel were considering different themes for mitigation, including family chaos, family violence, neglect and rejection, drugs, homelessness, and Rhode's influence.   (Doc. 57-28 at 70, 82).   According to Smith, she met with Lucas and his family members on numerous occasions; interviewed 30-40 potential witnesses; interviewed people who knew Rhode; and gathered medical, school and Department of Family and Children Services records on Lucas and his family. (Doc. 57-28 at 65-69).   She explained that she prepared memos containing all of the information that she gathered and she provided these memos to trial counsel.   (Doc. 57-28 at 66).   She testified regarding the family history of drug and alcohol abuse, family chaos, family violence, neglect, Debra's numerous abusive relationships, Ginger's sexually inappropriate conduct with Pelt and other teenage boys, as well as Lucas's homelessness prior to the crimes.   (Doc. 57-28 at 70-80).   Smith explained that she met with Aiken one time to give him an "oral life history" of Lucas so that he could testify at trial.   (Doc. 57-28 at 85).

Lucas submitted affidavits from numerous individuals, some of whom testified at trial and others who did not.   (Doc. 57-29 to Doc. 57-20).   These affiants provided additional details about, or examples of, Lucas's drug abuse, his family's history of violence and drug abuse, his homelessness, neglect, and Ginger's sexually inappropriate conduct with teenage boys and her verbal abuse of Lucas.

Following presentation of these witnesses and evidence, the state habeas court disagreed with Lucas's contention that trial counsel failed to adequately present mitigation evidence.   The court held that "trial counsel's presentation of mitigation evidence and trial counsel's arguments, which were based on strategic decisions after a thorough investigation, were not unreasonable and [Lucas] was not prejudiced by trial counsel not submitting the additional mitigation evidence or arguments presented to this Court."   (Doc. 65-10 at 36).

Lucas contends the state habeas court unreasonably applied *Strickland* when it "disregarded the evidence presented in the state habeas proceedings."   (Doc. 50 at 74). However, there is no indication that the state habeas court "failed to consider or unreasonably discounted mitigation evidence presented in the postconviction proceedings."  *Evans,* 703 F.3d at 1329.   "Nothing in the opinion of the [state habeas court] suggests that the court did not give appropriate mitigating weight to [Lucas's] postconviction evidence."  *Id.*   Instead, the state habeas court stated that it considered the "additional mitigation evidence or arguments presented" during the state habeas proceedings and found Lucas was not prejudiced by trial counsel's failure to present this evidence or advance these arguments.   (Doc. 65-10 at 36).

Citing *Porter v. McCollum*, 130 S. Ct. 447 2009), Lucas faults the state habeas court for not summarizing or "mention[ing]" the evidence presented during the state habeas corpus proceedings.   (Doc. 50 at 74).   The Eleventh Circuit recently rejected just such

an argument:

> [The] argument that the [state court] failed to say enough and instead
> "assumed the evidence was more harmful than helpful," would require us
> to decide that the [state court] should have provided a detailed explanation
> of the mitigating weight given to his postconviction evidence. . . .  Even
> when the mitigating weight given to the postconviction evidence is
> unclear, we must presume "that state courts know and follow the law."
> Nothing in *Porter* allows us to "[r]equir[e] state courts to put forward
> rationales for their decisions so that federal courts can examine their
> thinking."

*Evans*, 703 F.3d at 1329-30 (citations omitted).

Lucas alleges that the "state court unreasonably ruled that counsel made a strategic decision not to present evidence of Mr. Lucas's childhood."   (Doc. 50 at 75). Lucas also alleges that the state habeas court unreasonably found that Aiken and other witnesses were able to testify to Lucas's background.   (Doc. 50 at 76).   The state habeas court's findings regarding trial counsel's strategies were not unreasonable, nor were its findings regarding the testimony actually presented.   The state habeas court reasonably found that all witnesses possessed "both good and bad information," and there was "no evidence of direct abuse on [Lucas] by an elder or parent."   (Doc. 50 at 27-28).   Thus, trial counsel decided to present the family members who loved Lucas; show his lack of a violent criminal history; stress his remorse and acceptance of responsibility; and portray Rhode as the leader or main actor in the crimes.   The state habeas court also found that trial counsel did present evidence of Lucas's childhood and family history of substance abuse through his aunt, sister, and James Aiken.   The record supports these findings.

Because "some fairminded jurist could agree" with these findings, this Court cannot find that they are unreasonable.   *Holsey*, 694 F.3d at 1257.

Lucas argues that trial counsel were ineffective when they relied on Aiken to present evidence of Lucas's family background instead of retaining a "social work expert" to present this evidence.   He also alleges that trial counsel were ineffective when they failed to make an offer of proof as to what evidence Aiken would have presented when the trial court erroneously excluded his testimony.   The state habeas court ruled:

> Trial counsel also obtained the services of James E. Aiken, an expert specializing in the penal system, to explain to the jury that Petitioner was a redeemable person who could adjust well into the prison population and thus deserved a life sentence.   Mr. Aiken testified at the sentencing phase of Petitioner's trial as counsel wanted to show the jury that Petitioner could be safely incarcerated without being a risk to other inmates of the prison staff, thereby undermining any future dangerousness argument.

> In addition, trial counsel anticipated that Mr. Aiken would have been allowed to testify as to Petitioner's background.   Trial counsel explained that Mr. Aiken had interviewed Petitioner's family as he wanted to learn about Petitioner's background.   As such, trial counsel believed that Mr. Aiken would have been able to explain to the jury what he had learned about Petitioner in order to form his opinion as to Petitioner's adaptability to prison.   In addition, trial counsel was aware of the fact that the Southern Center had previously used Mr. Aiken in that capacity, and that the testimony had been allowed in other courts.   Accordingly, trial counsel had a reasonable belief that they would be able to present such testimony in Petitioner's trial through Mr. Aiken.

> Trial counsel explained that they made the decision to present Mr. Aiken instead of a psychologist or psychiatrist as they believed that he would be their best witness in mitigation.   As part of their strategy, trial counsel stated that they wanted to "cherry pick" positive mitigation evidence from

Mr. Aiken so that it would fit with his purpose in testifying.  By "cherry picking" their mitigation evidence from Mr. Aiken, trial counsel stated that they would have been able to elicit testimony regarding Petitioner's social background that could not have been safely brought out through other witnesses and keep out any potentially negative aspects, such as Petitioner's fights with his mother and diagnosis of anti-social personality traits from Central State Hospital.

Trial counsel testified that Mr. Aiken's testimony at trial went well and that he scored points with the jury.  During the trial, the trial court limited Mr. Aiken's testimony to generalizations regarding Petitioner's background. Trial counsel felt this ruling was error, however, the record before this Court establishes this claim was addressed and decided adversely to Petitioner on direct appeal.

Further, this Court finds that trial counsel were not deficient and Petitioner not prejudiced as this witness, along with the other mitigation witnesses, were able to testify to Petitioner's background without opening the door for potentially harmful information.

(Doc. 65-10 at 38-40).

Lucas has not shown that this ruling involved an unreasonable application of *Strickland* or that it was based on any unreasonable determinations of fact.   Lucas cites two pre-AEDPA Eleventh Circuit cases for the proposition that trial counsel were ineffective when they failed to make an offer of proof following the trial court's exclusion of Aiken's testimony.   (Doc. 50 at 69).   However, "[c]learly established federal law is not the case law of the lower federal courts, including [the Eleventh Circuit]." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (emphasis omitted). Additionally, these cases do not stand for the proposition that failure to make an offer of proof necessarily constitutes ineffective assistance of counsel.   For example, in *Collier v.*

*Turpin*, 177 F.3d 1184 (11th Cir. 1999), the court held that the petitioner demonstrated prejudice because "the failure of his counsel to make an offer of proof on the record, **or** effectively to present at sentencing the wealth of mitigating evidence, creates a reasonable probability that, but for their errors, he would not have a received a death sentence."  *Id*. at 1202 (emphasis added).   While Lucas's trial counsel did not make an offer of proof, the state habeas court found that trial counsel did effectively present mitigating evidence at sentencing.   Looking at the entire record, this was not an unreasonable finding.

In the second case cited by Lucas, *Smelcher v. Attorney Gen. of Alabama.*, 947 F.2d 1472 (11th Cir. 1991), the petitioner claimed that trial counsel were ineffective when they failed to object to the trial court's exclusion of evidence regarding the victim and petitioner's past sexual history and failed to make an offer of proof, which is specifically allowed by the Alabama Rape Shield statute, Code of Ala. § 12-21-203 (d)(1).   *Id.* at 1478. The state habeas court did not hold an evidentiary hearing to address the petitioner's ineffective assistance of counsel claim.   Thus, the Eleventh Circuit held that "[t]he district court should conduct a full hearing on any issues that have not been completely resolved because of an insufficient record."   *Id.* (citing *Clark v. Blackburn*, 619 F.2d 431 (5th Cir. 1980)).   In this case, the state habeas court conducted an evidentiary hearing and found that trial counsel were not ineffective.   State habeas counsel did not present Aiken as a witness and it does not appear that he submitted an affidavit containing any

additional testimony that he could have added to that which he presented at trial.   After considering all of the evidence that was presented, the state habeas court found trial counsel were not deficient and Lucas was not prejudiced because they did adequately present mitigating evidence.   These determinations are not objectively unreasonable.

Finally, Lucas again argues that counsel were ineffective for failing to call Stinger or Tackett.   According to Lucas, there was no evidence that trial counsel made a strategic decision not to call one or both of these experts to present Lucas's life story after the trial court barred Aiken from doing so.

In relation to the Stringer, the neuropsychologist, the state habeas court explained:

> Trial counsel . . . ultimately chose not to call Dr. Stringer to testify at trial as they were aware that if they had presented Dr. Stringer, then that would open the door for the State to have the Petitioner evaluated by their expert. Trial counsel testified that they had concerns with Petitioner being evaluated by the State as there was a chance that the State would present expert testimony that Petitioner was "mentally perfect in every way" or that, based on the Central State Hospital records diagnosing Petitioner with antisocial personality disorder, the evidence could be aggravating to the jury.   Trial counsel ultimately concluded that it was in Petitioner's best interest to keep the State from having him evaluated by their expert.
>
> This Court finds that trial counsel made a reasonable, strategic decision, after thorough investigation, to not present the testimony of Dr. Stringer and that Petitioner was not prejudiced.

(Doc. 65-10 at 37-38).

This ruling does not involve an unreasonable application of *Strickland* and is not based on any unreasonable determinations of fact.   Respondent argues that trial counsel

did not make a strategic decision regarding Stringer because the trial court had already ruled that the State could not have Lucas evaluated.   (Doc. 52 at 28).   During an August 27, 1999 pretrial hearing, the trial court ruled that "there won't be any mental evaluation ordered from this point forward, **unless we reconvene and have another hearing on it**." (Doc. 54-4 at 6) (emphasis added).   Thus, the trial court left open the possibility that its ruling could be changed in the future.   If trial counsel had called Stringer to testify about Lucas's neuropsychological testing and the results from such evaluations, there is a reasonable possibility that the trial court would have allowed the State to evaluate Lucas and present evidence.   *See Abernathy v. State*, 265 Ga. 754 (1995) (explaining that the State may offer expert mental health testimony in the sentencing phase in rebuttal to expert mental health evidence offered in mitigation by the defense).

In relation to Tackett, the pharmacologist, the state habeas court found:

> Trial counsel testified that it was a "community decision" not to call Dr. Tackett at trial as his testimony would have been cumulative of Dr. Cusack, and a portion of his testimony would have been contradictory to what Dr. Cusack had stated and thus potentially harmful to Petitioner's case.   In addition, trial counsel stated that they made a conscious decision to not call Dr. Tackett after learning that he would have testified at trial that Xanax would have had a mellowing effect on Petitioner.   Trial counsel explained that they had concerns about that type of testimony as it gave the jury the impression that the drug calmed a person down and mellowed them out, which would have backfired if presented at trial as the jury could conclude that Petitioner was very calm when he committed the murders.   Trial counsel stated that they did not want that impression left with the jury.

> This Court finds that trial counsel did not perform deficiently and Petitioner was not prejudiced in not having Dr. Tackett testify at

Petitioner's trial

(Doc. 65-10 at 38).

This ruling does not involve an unreasonable application of *Strickland*, nor is it based on any unreasonable factual determinations.   Trial counsel explained that they decided not to call Tackett because they had already presented the evidence about drug use and its effects with Cusack.   (Doc. 57-23 at 88).   They reasonably thought that "overemphasizing his voluntary drug use was not necessarily mitigating."   (Doc. 57-23 at 86).   Tackett also disagreed with Cusack regarding whether Lucas was in a blackout at the time of the murders.   (Doc. 57-23 at 117-18).   Thus, trial counsel thought that their opinions may seem contradictory and they wanted to provide the jury with a consistent message.   (Doc. 57-23 at 18).   Trial counsel also explained that they worried about the jury hearing Tackett's opinion that Xanax might have calmed Lucas down during the commission of the crimes.   (Doc. 57-23 at 116-18).

The Eleventh Circuit has explained that "'[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'" *Cook v. Warden, Ga. Diagnostic Prison*, 677 F.3d 1133, 1137 (11th Cir. 2012) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995)).   In this case, counsel made the strategic decision not to present Stringer and Tackett because they reasonably feared the potentially damaging evidence that could have been presented in rebuttal, thought that some of the drug testimony was cumulative, and that

other potential testimony was contradictory to that already presented.

Petitioner relies on *Williams v. Taylor*, 529 U.S. 362 (2000) for the proposition that trial counsel were ineffective in failing to convey to the jury the traumatic childhood and depth of abuse suffered by Lucas.  (Doc. 50 at 77).  Unlike the situation in *Williams*, "this is not a case where the additional evidence presented in the state collateral proceeding 'adds up to a mitigation case that bears no relation' to the mitigation case 'actually put before the jury.'"  *Holsey*, 694 F.3d at 1272 (quoting *Rompilla v. Beard*, 545 U.S. 374, 393 (2005)).  The facts in this case are easily distinguished from those in *Williams* and trial counsel's conduct in this case is not analogous to the conduct held to be ineffective in *Williams*.   Specifically, in *Williams*, trial counsel did not start preparing for mitigation until a week before the start of the trial and they "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams' nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records."  *Id*. at 395. Counsel failed to discover records showing Williams had been "severely and repeatedly beaten by his father."  *Id*.  Moreover, records showed that both of his parents were imprisoned for two years for criminal neglect of Williams and his siblings.   Id. During their incarceration, Williams had to endure an abusive foster home.   *Id*. Additionally, counsel failed to introduce available evidence that Williams was "borderline mentally retarded."  *Id*. at 396.   Instead, Williams' counsel called

Williams' mother and two neighbors (one of whom had never been interviewed) to testify and presented a taped excerpt from a psychiatrist. *Id*. at 369. The crux of their brief testimony was that Williams was a nice boy who was not violent. *Id.* While counsel did establish through cross examination of the State's witnesses that Williams turned himself in, which enabled police to solve the crime, "[t]he weight of [their] closing . . . was devoted to explaining that it was difficult to find a reason why the jury should spare Williams' life." *Id*.

Unlike Williams' attorneys, trial counsel in this case conducted an extensive investigation into Lucas's background. Furthermore, based on this investigation, trial counsel chose specific strategies for mitigation. Nothing in *Williams* requires Petitioner's trial counsel to present any mental health evidence or any additional lay witnesses to discuss Petitioner's background. The Eleventh Circuit has explained that "*Williams* creates no mechanistic rule of law at all for investigation or for presentation of evidence in capital cases." *Chandler v. United States*, 218 F.3d 1305, 1317 n.21 (11th Cir. 2000). Put simply, "*Williams* cannot command the outcome for this case; the cases' facts are materially different, allowing different outcomes under *Strickland.*" *Id.*

The state habeas court's decision that trial counsel were not ineffective in investigating and presenting mitigation evidence did not involve an unreasonable application of *Strickland* and was not based on any unreasonable determinations of fact. Lucas has not shown that the state habeas court's "conclusion was an 'extreme

malfunction[] in the state criminal justice system[]'that is so 'well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Holsey*, 694 F.3d at 1273 (quoting *Harrington*, 131 S. Ct. at 786-78).   Therefore, this Court must deny relief.

### B.   The Exclusion of James Aiken's Testimony

Trial counsel hoped to use James Aiken in a "dual role," both as an "incarceration expert" and as a "social historian" to testify regarding Lucas's background.   (Doc. 57-23 at 84-85).   Aiken testified that he had extensive experience in the maximum security prisons both in the United States and internationally.   He explained that he had worked in prisons "in the capacity of a Social Worker, Administrative Assistant to a Warden, a Deputy Warden, as well as Warden, Deputy Regional Administrator, Commissioner, Technical Assistance Provider, and Consultant."   (Doc. 55-4 at 137).   Without objection, he was qualified as an expert in corrections and classification.   (Doc. 55-4 at 143).

He testified that his investigation involved reviewing Lucas's school records, jail records, medical records, and psychological records, as well as interviewing Lucas's family members and jail staff.   (Doc. 55-4 at 144-45, 151).   He explained that jail records were very important because how a person behaves in a community does not necessarily predict how that person will behave in a prison setting.   He said that he had seen "thousands of times" that people who commit heinous crimes can actually make model prisoners.   (Doc. 55-4 at 145-46).   He testified that Lucas's jail records and information

obtained from jail staff show that Lucas is a good inmate.   (Doc. 55-4 at 149-50)   Aiken stated that Lucas would, based on the crimes committed, always be confined in a maximum security facility.   (Doc. 55-4 at 149).   He explained that, based on his 29 years in corrections and on what he learned while investigating this case, Lucas could be confined in a maximum security prison for the remainder of his life without presenting a threat to anyone.   (Doc. 55-4 at 147).

About Lucas's family background, Aiken explained[8] that "from generation to generation," there had been alcohol abuse, sexual abuse, abject poverty, and a lack of structure.   (Doc. 55-4 at 155).   He stated that Lucas's mother had been beaten by Lucas's alcoholic father and physically abused by various boyfriends.   According to Aiken, the family setting was one in which "a kid that's coming home from school . . . doesn't know what he's going to meet."   (Doc. 55-4 at 155).   After the trial court sustained the State's objection to further details regarding Lucas's background, Aiken stated that the nonviolent manner in which Lucas handled the "chaotic environment" was important.   (Doc. 55-4 at 156).   He explained that there was no indication Lucas was ever violent in school, in his "family domestic situation," or in the community. (Doc. 55-4 at 157).

On direct appeal, the Georgia Supreme Court held:

The trial court qualified James Aiken as an expert on corrections and the

---

[8]  Aikens's exact testimony, as it relates to Lucas's background, is quoted above on page 40 of this Order.

classification of prisoners.  Mr. Aiken testified that his evaluation of a prisoner's adaptability to prison life is often based in part on a review of the prisoner's family background.   After Mr. Aiken had given some testimony about Lucas's family history, including an expression of his general impression of the nature of Lucas's background, the State objected on the ground that Mr. Aiken had begun testifying outside the area of his expertise.   We find that the trial court erred by sustaining the objection on the ground raised, but we further find that the error was harmless beyond a reasonable doubt in light of the testimony actually given, which included generalizations about Lucas's background, some detail about his family history, and a clear expression of the witness's conclusions.

*Lucas*, 274 Ga. at 648, 555 S.E.2d at 448.

Lucas contends that the trial court's error prevented Aiken from substantiating his opinion that Lucas would not pose a danger to others if sentenced to life in prison and prevented the jury from learning about Lucas's upbringing.   Thus, the trial court's error was harmful under *Brecht v. Abrahamson*, 507 U.S. 619 (1993) and the Georgia Supreme Court's analysis was objectively unreasonable.

The Georgia Supreme Court applied the harmless error standard announced in *Chapman v. California*, 386 U.S. 18 (1967):   A constitutional error is harmless only if the reviewing court can "declare a belief that it was harmless beyond a reasonable doubt." *Id*. at 24.   On collateral review, however, "a federal constitutional error is harmless unless there is 'actual prejudice,' meaning that the error had a 'substantial and injurious effect or influence' on the jury's verdict."   *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012) (quoting *Brecht*, 507 U.S. at 637).   "[A] federal habeas court may deny relief based solely on a determination that the constitutional error is harmless

under the *Brecht* standard." *Id*. at 1308. When making the harmless error determination, the Court views "the evidence through the lens of AEDPA." *Id.* at 1309. Thus, any factual findings are presumed correct and Lucas bears the burden of rebutting the presumption by clear and convincing evidence. *Id.* This Court must, however, make a *de novo* determination whether the constitutional error "'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 1313 (quoting *Brecht*, 507 U.S. at 637). To make this determination, the Court reviews the "record as a whole." *Id*. at 1315.

Contrary to Lucas's contention, the Court finds that Aiken was able to substantiate his opinion that Lucas would not pose a danger to others if sentenced to life in prison. He explained that, due to the nature of the crimes committed, Lucas would always remain confined in a maximum security prison and, in such a setting, he would not be a threat to others. He substantiated this finding pointing to school and jail records, which showed that Lucas had not been violent in either structured setting. Also, he explained that interviews with family members showed a terrible, chaotic environment to which Lucas did not respond with violence.

Moreover, the record as a whole shows that the jury did learn about Lucas's background. They learned: (1) Many members of Lucas's family (maternal great grandfather, maternal grandmother, mother, father, and aunt) abused drugs and alcohol (Doc. 55-4 at 106-08); (2) Lucas's mother was placed in foster care, had to care for her

younger siblings because her mother was too drunk or high to do so, and she became pregnant when she was either seventeen or eighteen (Doc. 55-4 at 106-10); (3) Lucas's parents regularly used drugs in the household while Lucas was growing up and while he was present in the house (Doc. 55-4 at 110); (4) Due to drug and alcohol abuse, Lucas's parents were unable to care for him and he had to stay with his grandparents on many occasions (Doc. 55-4 at 110-13); (5) Lucas's parents fought in front of him and his younger sister, who Lucas attempted to protect (Doc. 55-4 at 117); (6) Lucas started abusing drugs (including Xanax, Darvocet, marijuana, mushrooms, methamphetamine, cocaine, and angel dust) and alcohol when he was just twelve or thirteen years old (Doc. 55-1 at 14-15; Doc. 55-2 at 158-60); (7) Lucas was homeless at the time of the murders because his mother had kicked him out the house and his father, who did not attend one day of his trial, never cared about him (Doc. 55-2 at 160; Doc. 55-4 at 121); and (8) Lucas always felt abandoned and neglected.   (Doc. 55-2 at 160).   Additionally, Aiken told the jury that throughout several generations there had been poverty, drug abuse, alcohol abuse, and violence in Lucas's family.

Looking at the entire record, the Court finds that the trial court's exclusion of further testimony from Aiken did not have a "substantial and injurious effect or influence in determining the jury's verdict."   *Brecht*, 507 U.S. at 337 (citations omitted). Thus, the Court must deny relief on this claim.

### C.   Rhode's Central State Hospital Records

Rhode was admitted to Central State Hospital after he attempted suicide while awaiting trial.   (Doc. 38 at 2).   Both Lucas and the State made pretrial requests for all records of Rhode's stay at Central State Hospital.   (Docs. 53-6 at 24, 28-29; 54-24 at 79). Lucas's trial counsel sought these records because of the possibility that they would contain exculpatory or mitigating evidence that would support Lucas's defense at trial. (Doc. 53-6 at 24-29).   Central State Hospital objected to the release.[9]   The trial court entered an Order that provided:

> IT IS HEREBY ORDERED THAT pursuant to O.C.G.A. § 37-7-166(a)(7) that except for matters privileged under the laws of this state, the records of Brandon Rhode be produced to the Court for an <u>in camera</u> inspection and subsequent possible release to defendant's attorneys for use at the trial in this case.

(Doc. 53-7 at 65).

Before opening statements at Lucas's trial, the judge explained to the parties that Central State Hospital had turned the records over to him and he was going to conduct an in camera review to determine what, if any, records he would release to the parties. (Doc. 54-20 at 30).   Later in the trial, the judge informed the parties that it had taken him "several hours" to "very carefully" review Rhode's Central State Hospital records and he found "no exculpatory material" and no material that "would be applicable in any mitigating situation."   (Doc. 54-24 at 79).   He refused to disclose the records to either

---

[9]  Neither party has been able to locate the pleading filed by Central State Hospital or any transcript of a hearing regarding the matter.

party.

On direct appeal, Lucas challenged the trial court's refusal to allow him access to

Rhode's Central State Hospital records.   The Georgia Supreme Court held:

> The trial court, after conducting a thorough in camera review, refused to disclose the records of treatment received by Lucas's co-defendant during the co-defendant's incarceration.   Lucas argues that the records were not prepared in the course of voluntary treatment and thus were not subject to the psychiatrist-patient privilege.   However, because our review of the records indicates that they were prepared in the course of treatment, we conclude that the patient-psychiatrist privilege applied to them, regardless of whether that treatment was voluntary.   A plurality of this Court has held that "in order to abrogate the psychiatrist-patient privilege, the [criminal] defendant must make a showing of necessity, that is, that the evidence in question is critical to his defense and that substantially similar evidence is not otherwise available to him."   Applying that standard, we find that the trial court did not err in failing to disclose portions of the records that reflected psychiatrist-patient communications.   Pretermitting the question of whether the trial court erred by failing to disclose any of the remaining portions of the records, we find beyond a reasonable doubt that their disclosure to Lucas would not have affected the outcome of either phase of the trial.

*Lucas,* 274 Ga. at 645, 555 S.E.2d at 446 (citations and footnotes).

The record on appeal does not show what records the Georgia Supreme Court

reviewed.   As this Court previously stated, it appears that the Georgia Supreme Court

reviewed both privileged and non-privileged records.   (Doc. 46 at 4).   After Lucas filed

his state habeas petition, the Clerk of Jones County Superior Court was ordered to

unseal all "sealed proceedings, pleadings, orders, documents and exhibits."   (Doc.

38-2).   Rhode's Central State Hospital Records were not present among the unsealed

documents.   (Doc. 33; Doc. 38).   In this Court, Lucas sought to supplement the record

with Rhode's publicly available mental health records.   (Doc. 37).   The Court granted

his motion and Lucas filed Rhode's publically available Central State Hospital records.

(Doc 46; Doc. 47).

A review of these records reveals, *inter alia*, Rhode started seeing a psychiatrist at

age five; was unruly in school; had a criminal history dating back to age 13; and suffered

from several psychiatric conditions, including depressive disorder, polysubstance abuse,

antisocial personality disorder, malingering, major depression with psychotic features as

well as schizoaffective disorder.   (Doc. 47-1).   Some records indicate that he was

suicidal, not homicidal, during his stay at Central State Hospital, and that he presented a

danger to himself, not others.   (Doc. 47-1 at 76-77).   However, other records showed

that he was in at least two altercations with fellow patients at the hospital.   (Doc. 47-1 at

108-110).

Lucas alleges that these records "corroborate[] a key defense argument:   that

Rhode was more likely than Mr. Lucas to have been the moving force behind the crime."

(Doc. 50 at 96).   According to Lucas, the Georgia Supreme Court unreasonably applied

clearly established federal law when it upheld the trial court's decision to deny

disclosure.   Lucas cites *Lockett v. Ohio*, 438 U.S. 586 (1978) and its progeny as the clearly

established federal law.   In *Lockett*, the Ohio statute in question did not permit the

sentencing judge to consider, as mitigating factors, the defendant's character, prior

record, age, lack of intent to cause death, and his relatively minor role in the crime.   *Id*.

at 597.   The Supreme Court held:

> [T]he Eighth and Fourteenth Amendments require that the sentencer, in all
> but the rarest kind of case, not be precluded from considering as a
> mitigating factor, any aspect of a defendant's character or record and any
> of the circumstances of the offense that the defendant proffers as a basis for
> a sentence less than death.

*Id*. at 604 (emphasis omitted).

*Lockett* did not clearly establish that a defendant must have access to, and be allowed to admit into evidence, a non-testifying codefendant's privileged mental health records without consent.   While a defendant must be given wide latitude as to what he can present in mitigation, none of the cases Lucas cites stand for the contention that a defendant may ignore all rules of evidence and privilege in presenting the evidence.

Lucas cites *Chambers v. Mississippi*, 410 U.S. 284 (1973), *Greene v. Georgia*, 442 U.S. 95 (1979), *Skipper v. South Carolina*, 476 U.S 1 (1986), and *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) for the proposition that "[w]hen the application of an evidentiary rule—including a privilege rule—would restrict the accused's fundamental right to present evidence in his own defense, the rule 'may not be applied mechanistically to defeat the ends of justice.'"   (Doc. 50 at 95) (quoting *Chambers,* 410 U.S. at 302).   There is no indication of a mechanistic application of an evidentiary rule in this case.   Instead, the trial court denied disclosure after it conducted an in camera inspection of Rhode's Central State Hospital Records and on appeal, the Georgia Supreme Court found that Rhode had not shown a "necessity" to gain access to the records.   He had not shown

that "the evidence in question [was] critical to his defense and that substantially similar evidence [was] not otherwise available."   *Lucas,* 274 Ga. at 645, 555 S.E.2d at 446.   This is exactly the type of inquiry that was sanctioned in *Ritchie.*   *Ritchie*, 480 U.S. 39 (1987) (explaining that a confidential file should be reviewed by trial court to determine the materiality of the documents contained therein).

While the Central State Hospital records arguably show Rhode's bad character, this Court, employing AEDPA deference, cannot find that the Georgia Supreme Court's ruling that disclosure would not have affected the outcome of either phase of the trial was based on any unreasonable findings of fact or involved an unreasonable application of federal law.   Lucas was allowed to present considerable evidence of Rhode's bad character.   Trial counsel showed:   (1) Rhode had been involved in many burglaries over many months while Lucas was involved in no more than three, all of which occurred just a few days prior to the crimes (Doc. 55-2 at 155-57); (2) Since he was a teenager, Rhode had been arming himself with stolen guns and burglarizing homes (Doc. 55-4 at 96-99); (3) Since he was a young teen in Louisiana, Rhode had been encouraging and teaching other less-experienced boys how to burglarize homes (Doc. 55-4 at 96-99); (4) Prior to the murders, Rhode was the one stockpiling weapons at his home (Doc. 55-2 at 155-57); (5) Rhode drove Lucas to and from the crime scene (Doc. 55-2 at 123); (6) It was Rhode's idea to return to the Moss home after they had already burglarized it once; (Doc. 54-27 at 42); (7) Following his arrest for the murders, Rhode

successfully escaped from the Jones County Jail (Doc. 55-4 at 61-63); (8) After capture

following his escape, Rhode, as part of a second escape attempt, assisted another inmate

who attacked a female guard; (Doc. 55-4 at 68-69); (9) Rhode was convicted of mutiny

and criminal attempt to escape after his second escape attempt; (Doc. 55-4 at 68-69); (10)

When taking a polygraph examination, Rhode's negative responses to the questions

about whether he shot Stephen, Kristen, or Bryan showed deception (Doc. 55-4 at 78-83);

and (11) Rhode confessed to shooting two of the victims.   After hearing all of this

testimony, the jury still found Lucas guilty and sentenced him to death.   Lucas fails to

show that disclosure of Rhode's Central State Hospital records would likely have

changed either of these outcomes.   *Ritchie*, 480 U.S. at 58 (explaining that "if the

nondisclosure was harmless beyond a reasonable doubt" the conviction must be

upheld).

Lucas claims that the Central State Hospital records "would have led the jury in

Mr. Lucas's case to conclude that Rhode, not Lucas, was more likely to have played the

lead role in the crime."   (Doc. 50 at 97).   Lucas confessed to his "role in the crime":   He

stated that he, not Rhode, was the first one to shoot someone that day when he shot

Bryan immediately after the child arrived home.   Lucas also confessed to making the

wounded boy go into a bedroom where he finally killed him by shooting him an

unknown number of times.   Lucas explained that, at some point during the murders, he

went to Rhode's car to retrieve another gun, which he then used to shoot Kristen Moss

two more times.   (Doc. 54-3 at 1-41).

Taking all of the evidence into consideration, the state court's adjudication of this claim did not involve an objectively unreasonable application of clearly established federal law and was not based on an unreasonable determination of the facts.

### D. Prosecutor's Statements Regarding Escapes

As explained above, Lucas presented the testimony of James Aiken, an expert in corrections and classification.   (Doc. 55-4 at 132).   Aiken testified that in his "opinion . . . Lucas can be confined in a maximum security prison for the remainder of his life without presenting a harm to staff, other inmates or the community."   (Doc. 55-4 at 151).   On cross examination, the District Attorney, after explaining that he was "Fred Bright, . . . the District Attorney of the Ocmulgee Judicial Circuit," asked Aiken, "Would it surprise you if we had escapes occurring . . . all the time that we prosecute over in Baldwin County, all the time, every day?   Would that surprise you?"   (Doc. 55-5 at 5-6).   Trial counsel objected, but the objection was overruled.   On direct appeal, Lucas argued that the District Attorney's false and improper comments about escapes violated his Fifth Amendment due process right to a fair trial, his Sixth Amendment right to confront witnesses, and his Eighth Amendment right to a reliable determination of punishment. (Doc. 50 at 105).   The Georgia Supreme Court held:

> Lucas also contends that the State's cross-examination of Mr. Aiken was improper.  Mr. Aiken had testified that Lucas could be safely confined and would not pose any future danger to the community.  The district attorney cross-examined Mr. Aiken on his knowledge of Georgia prisons

and the frequency of escapes from them.   This subject matter was a proper subject for cross-examination, as the issue of prison security had been raised by the witness.   However, we find merit in the objection Lucas raised asserting that the district attorney had been unclear or had exaggerated in his use of the phrase "every day" in describing the frequency of escapes.   Nevertheless, we find, considering the trial record, that the ensuing exchange between the witness and the district attorney rendered harmless any error in the trial court's not addressing the district attorney's use of hyperbole, particularly because the district attorney himself later clarified that he was using the phrase as an idiom and not literally.   Likewise, we conclude that any error in the trial court's failure to sustain a later defense objection to the district attorney's "testifying" in his cross-examination questions was harmless in light of the questions and testimony viewed as a whole.

*Lucas*, 274 Ga. at 648-49, 555 S.E.2d at 448-49.

In *Darden v. Wainwright*, 477 U.S. 168 (1986), the United States Supreme Court explained that "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"   *Id*. at 180 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).   The Eleventh Circuit has explained:

> [H]abeas relief is due to be granted for improper prosecutorial argument at sentencing only where there has been a violation of due process, and that occurs if, but only if, the improper argument rendered the sentencing stage trail fundamentally unfair.   An improper prosecutorial argument has rendered a capital sentencing proceeding fundamentally unfair if there is a reasonable probability that the argument changed the outcome, which is to say that absent the argument the defendant would not have received a death sentence.   A reasonable probability is one that is sufficient to undermine confidence in the outcome.

*Romine v. Head*, 253 F.3d 1349, 1366 (11th Cir. 2001).

Lucas claims that the Georgia Supreme Court's determination that the comments

were harmless was partly based on an unreasonable finding of fact: The District Attorney clarified that he used the phrase "every day" as an idiom and not literally.   A state court's "determination of the facts is unreasonable only if no 'fairminded jurist' could agree with the state court's determination or conclusion." *Holsey*, 694 F.3d at 1257.   This Court finds that some fairminded jurists could agree with the Georgia Supreme Court.   The District Attorney explained during his questioning of Aiken that "when I say escape every day, I mean it's –it's a very common occurrence."   (Doc. 55-5 at 9).

Lucas also complains that the Georgia Supreme Court's "cursory disposition" of this claim shows no evidence that it considered the factors relevant to assessing whether a defendant is entitled to a new proceeding based on the District Attorney's improper remarks.   The state court is not required to list all, or any, of the factors it considered in reaching its determination.   *Wright*, 278 F.3d at 1255 (explaining that nothing in the language of § 2254(d) "requires the state court adjudication that has resulted in a decision to be accompanied by an opinion that explains the state court's rationale.").

The record shows that on cross examination, the District Attorney questioned Aiken whether he would be surprised to learn that there are escapes occurring in Baldwin County "all of the time" and that they prosecute them "all of the time, every day."   (Doc. 55-5 at 6).   On redirect, Aiken explained there "are six classification security levels that the Georgia Department of Corrections uses to classify the

institutions."   (Doc. 55-5 at 14).   The maximum security prisons are level six, which "are the most secure and restrictive facilities for inmates who are escape risks, have a history of violence in prison or were convicted of heinous crimes."   (Doc. 55-5 at 15). Aiken stated that Lucas committed a "heinous crime" so he would be confined in a level six maximum security prison.   (Doc. 55-5 at 15).   He explained that Lucas would never be confined in a level five, four, or three facility.   (Doc. 55-5 at 15-17).   It was also established that all of the state prisons in Baldwin County, from which the District Attorney claimed escapes are common, are classified as level three or four facilities. (Doc. 15-16).   On recross, the District Attorney established that individuals convicted of murder can be housed in a level three or level four facility.   (Doc. 55-5 at 20).   However, Aiken clarified that in the prison classification system, there is a difference between "heinous crime" and murder and while it is possible a murderer may be confined in a level three or level four facility, it would not be so "in this particular case" due to Lucas's commission of a "heinous crime."   (Doc. 55-5 at 20).

Looking at this record, and applying AEDPA deference, the Court finds that the Georgia Supreme Court's decision on this issue was not contrary, or involve an unreasonable application of, federal law, and it was not based on any unreasonable factual findings.   This Court must, therefore, deny relief on this claim.

### E.  Penalty Phrase Jury Instructions

During the charge conference that was held at the close of the sentencing phase,

the judge explained that he was going to use the "pattern charge" regarding the existence of non-statutory mitigating circumstances. (Doc. 55-5 at 32). Trial counsel objected and requested a separate charge which would specifically explain that the jury need not reach a unanimous decision as to the existence of mitigating circumstances. (Docs. 55-5 at 32; 81; 53-7 at 129). The trial court charged the jury, in relevant part:

> [I]t now becomes your duty to determine within the limits prescribed by law what punishment will be imposed for these offenses. In arriving at this determination, you are authorized to consider all the evidence received here in Court in both stages of this trial . . . . You shall also consider the facts and circumstances, if any, in extenuation, mitigation or aggravation of punishment. Mitigating or extenuating facts or circumstances are those which you, the jury, find do not constitute a justification or excuse for the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. Aggravating circumstances are those which you, the jury, find increase the guilt or enormity of the offense or add to its injurious consequences. . . .
>
> Under our law, a sentence of death or life imprisonment without parole shall not be imposed unless the jury first finds beyond a reasonable doubt and designates in its verdict in writing at least one or more statutory aggravating circumstances and next fixes the sentence of death or life imprisonment without parole in its verdict. . . .
>
> [W]hether or not any one or more of the statutory aggravating circumstances . . . exist beyond a reasonable doubt in this case is a matter solely for you, the jury, to determine from the evidence in this case. . . .
> [Y]ou may set the penalty to be imposed at life imprisonment. It is not required and it is not necessary that you find any extenuating or mitigating fact or circumstance in order for you to return a verdict setting the penalty to be imposed at life imprisonment. Whether or not you find any extenuating or mitigating facts or circumstances, you are authorized to fix the penalty in this case at life imprisonment. If you find from the evidence beyond a reasonable doubt the existence in this case of one or more statutory aggravating circumstances  . . . then you would be

authorized to recommend the imposition of a sentence of life imprisonment without parole or a sentence of death, but you would not be required to do so.   If you should find from the evidence in this case beyond a reasonable doubt the existence of one or more statutory aggravating circumstances . . . you would also be authorized to sentence the Defendant to life imprisonment.   You may fix the penalty at life imprisonment if you see fit to do so for any reason satisfactory to you or without any reason. . . .

[Y]our verdict as to penalty must be unanimous.

(Doc 55-5 at 68-77).

On direct appeal, Lucas argued that the trial court's penalty phase charge improperly implied that the jury was required to reach unanimity on mitigating circumstances before considering them, and failed to instruct the jury that it was required to reach unanimity regarding all aggravating circumstances.   (Doc. 55-30 at 28-33).   The Georgia Supreme Court held:

The trial court was not required to charge the jury on a burden of proof applicable to non-statutory aggravating circumstances or to charge the jury regarding what weight such evidence should be given.   Instead, the trial court properly charged the jury that it was authorized to impose life sentences for any reason or no reason.

The trial court was not required to charge the jury that mitigating circumstances need not be found unanimously, because it charged the jury that it could impose a life sentence for any reason or no reason.

*Lucas*, 274 Ga. at 650, 555 S.E.2d at 450.

In his amended state habeas petition, Lucas claimed that "[t]he sentencing jury instructions in this case were ambiguous, insufficient, vague and confusing."   (Doc. 57-17 at 41).   As an "example," Lucas stated that "the sentencers in the case at bar were

not given an instruction that indicated that their decision on the existence of aggravating factors had to be unanimous."   (Doc. 57-17 at 41).   Lucas also alleged again that the "jurors were not instructed that they did not have to be unanimous in the finding of mitigating factors or that there was no standard of proof for the finding of mitigating circumstances."   (Doc. 57-17 at 41).   The state habeas court found the latter claim was "not reviewable based on the doctrine of *res judicata*," but held as follows regarding the former:   "As to [Lucas's] claim regarding the unanimity instruction with regard to aggravating circumstances, 'reversal on this ground is not required when, as in this case, the trial court charged the jury that its verdict as to the penalty must be unanimous.'" (Doc. 65-10 at 45) (citations omitted).

Lucas claims that the state courts' unreasonably applied clearly established federal law.   In *Mills v. Maryland*, 486 U.S. 367 (1988), the United States Supreme Court held that jury instructions are unconstitutional if there exists "a substantial probability that reasonable jurors, upon receiving the judge's instructions in [the] case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance."   *Id.* at 384.

In *Mills*, the jurors were instructed by the judge and the verdict form to mark either "yes" or "no" regarding the existence of mitigating circumstances.   *Id.* at 378. "Although it was clear that the jury could not mark 'yes' in any box without unanimity,

nothing the judge said dispelled the probable inference that 'no' is the opposite of 'yes,' and therefore the appropriate answer to reflect an inability to answer a question in the affirmative."   *Id*.   Thus, the jury could reasonably understand that they must unanimously agree on any one mitigating circumstance before they could consider it.

In *McKoy v. North Carolina*, 494 U.S. 433 (1990), the trial judge, in accordance with the unanimity requirement in North Carolina's capital sentencing scheme, specifically instructed the jury that they must unanimously find a mitigating circumstance to exist before considering it.   *Id*. at 436.   The verdict form "reiterated the unanimity requirement."   *Id*.   It instructed the jury to write "yes" after each mitigating circumstance that they unanimously found to exist and to write "no" after each mitigating circumstance that they did not unanimously find to exist.   *Id*.   Because the instructions and verdict form "expressly limited the jury's consideration to mitigating circumstances unanimously found" they were unconstitutional.   *Id*. at 444 n.8.

Unlike the situation in *McKoy*, the trail judge's instructions and the verdict form in this case did not expressly limit the jury's consideration only to mitigating circumstances unanimously found.   Unlike the situation in *Mills*, the Court fails to see how reasonable jurors, upon receiving the judge's instructions and in reviewing the verdict form, could have thought they were precluded from considering any mitigating evidence unless all twelve jurors agreed on the existence of such a particular circumstance.   The trial court did not require any written findings on mitigating

circumstances and explicitly instructed the jurors that such findings were not necessary as they could impose a life sentence "for any reason satisfactory to you or without any reason."   (Doc. 55-5 at 75).   The trial court instructed the jury that it was not necessary for them to find any mitigating circumstances in order to impose a life sentence.   Based on these findings, the Georgia Supreme Court's determination of this issue did not involve an unreasonable application of federal law.

Regarding the trial court's failure to give a separate charge that unanimity was required as to aggravating circumstances, the trial court instructed the jury that it could not impose the death penalty unless it "first finds beyond a reasonable doubt and designates in its verdict in writing at least one or more statutory aggravating circumstances."   (Doc. 55-5 at 69).   The jury was instructed that their verdict as to penalty must be unanimous and the "Verdict as to Sentencing" form required the jury to expressly find whether statutory aggravating circumstances existed and to show which statutory aggravating circumstances had been proven beyond a reasonable doubt. (Doc. 53-8 at 11-16).   The judge's instructions, coupled with the verdict form, informed the jury that unanimity was required as to aggravating circumstances.   Therefore, the state habeas court's ruling on this issue was not based on any unreasonable findings of fact, nor did not involve an unreasonable application of federal law.

## F.  Proportionality Review

Lucas claims that the Georgia Supreme Court no longer conducts meaningful

proportionality review necessary to prevent arbitrary application of the death penalty.

(Doc. 50 at 121).   Georgia law requires the Georgia Supreme Court to review each death

sentence to determine "[w]hether the sentence of death is excessive or disproportionate

to the penalty imposed in similar cases, considering both the crime and the defendant."

O.C.G.A. § 17-10-35(c)(3).   In this case, the Georgia Supreme Court held:

> The summary of evidence set forth above . . . demonstrates the highly aggravated nature of Lucas's crimes.   Although there was evidence of alleged intoxication and other allegedly-mitigating factors presented to the jury, we do not find the jury's reaction to the evidence viewed as a whole to have been excessive.   Because this Court's proportionality review "includes special consideration of the sentences received by co-defendants in the same crime," we note that Lucas's co-defendant, Rhode, also has been sentenced to death.
>
> We conclude, considering both the crimes and the defendant, that the death sentences imposed for the murders in this case were neither excessive nor disproportionate to the penalties imposed in similar cases in Georgia.   The cases appearing in the Appendix support this conclusion in that each demonstrates a jury's willingness to impose a death sentence where a defendant has committed more than one murder, whether in one transaction or over time.

*Lucas*, 274 Ga. at 651-52, 555 S.E.2d at 450-51.

The court listed twenty-six cases in its Appendix.   Id. at 652, 555 S.E.2d at 451.

The state habeas court found that Lucas's claim that his death sentence is

disproportionate was not reviewable based on the doctrine of *res judicata*.   (Doc. 65-10 at

3).   Additionally, that court found Lucas's claim "that the proportionality review

conducted in Georgia is constitutionally infirm in general and as applied" was

procedurally defaulted.   (Doc. 65-10 at 6).

Lucas claims that proportionality review is meaningful only when the court considers "the nature of the defendant" along with "similar cases in which the death penalty was imposed, . . . similar cases in which the death penalty was sought but not imposed, and similar cases in which the State did not even seek the death penalty." (Doc. 50 at 125). Lucas alleges that the Georgia Supreme Court currently conducts only a cursory review that invariably results in affirming the sentence of death and that proportionality review no longer exists in practice. (Doc. 50 at 126).

In its April 12, 2011 Order, the Court found that Lucas's claim that the proportionality review as presently conducted by the Georgia Supreme Court is severely truncated and results in the arbitrary imposition of the death penalty had not been procedurally defaulted and that it had been exhausted. (Doc. 27 at 15). However, the Court also explained that a federal court's review of such an issue was severely limited. (Doc. 27 at 15).

The Court firsts notes that there is no constitutional right to proportionality review. Neither *Gregg v. Georgia,* 428 U.S. 153 (1976), nor any cases that have followed, have held that Georgia courts must conduct any proportionality review. In fact, the United States Supreme Court has held that it would be error to conclude "that *Gregg* required proportionality review." *Pulley v. Harris*, 465 U.S. 37, 46 (1984).

When a state statute calls for the state court to conduct a proportionality review, the Eleventh Circuit has cautioned the district court to refrain from "inject[ing] itself into

the state sentencing procedure." *Moore v. Balkcom*, 716 F.2d 1511, 1519 n.6 (11th Cir.

1983).   The Eleventh Circuit has explained:

> A federal habeas court should not undertake a review of the state supreme
> court's proportionality review and, in effect, "get out the record" to see if
> the state court's findings of fact, their conclusion based on a review of
> similar cases, was supported by the "evidence" in the similar cases.   To do
> so would thrust the federal judiciary into the substantive policy making
> area of the state.   It is the state's responsibility to determine the procedure
> to be used, if any, in sentencing a criminal to death.

*Id*. at 1518.

"Our review remains confined to whether the state sentencing procedure both on

its face and as applied violates the eighth and fourteenth amendments."   *Id.* at 1519 n.6.

In this case, it does not.   The application of the death penalty under the facts of this case

do not "'shock the conscience.'"   *Id*. at 1518 (quoting *Spinkellink v. Wainwright*, 578 F.2d

582, 606 n.28 (5th Cir. 1978)).

Lucas complains that the Georgia Supreme Court "discussed proportionality in a

single paragraph" and, "[i]n a footnote, . . . listed 26 supposedly comparable cases

without any discussion or analysis."  (Doc. 50 at 121).   He complains that the court fails

to "discuss or describe supposedly comparable cases" and "address[es] proportionality

in just a few sentences, then attache[es] as an appendix a 'string cite' of cases, with no

analysis. . . . "  (Doc. 50 at 129).   The Eleventh Circuit has rejected such complaints:

> We also reject [the] claim that the [state] . . . courts violated his
> constitutional rights by not conducting a detailed determination of the
> proportionality and appropriateness of his death sentence in comparison
> with other capital murders.   The Constitution does not require a

proportionality review.   And we refuse to mandate as a matter of federal constitutional law that where, as here, state law requires such review, courts must make an explicit, detailed account of their comparisons. Based on their own past experience in reviewing capital punishment cases, state appellate courts "can rationally distinguish between those individuals for whom the death penalty is an appropriate sanction and those for whom it is not," without listing in their opinions the facts that did or did not justify the imposition of the death penalty in prior cases.

*Lindsey v. Smith*, 820 F.2d 1137, 1154 (11th Cir. 1987) (citations omitted).

The Court denies relief on this claim.

## G.  Cumulative Effect

Lucas maintains that "the errors that infected [his] trial deprived him of the opportunity to make the case for his life."  (Doc. 52 at 62).   He alleges that the prosecutor suppressed exculpatory evidence and improperly introduced victim impact testimony.   He alleges that the trial court erred: (1) when it allowed the prosecutor to falsely claim that inmates escape every day; (2) when it allowed Lucas's confession to be admitted into evidence; (3) when it limited Aiken's mitigation testimony; and (4) when it improperly instructed the jury.   Lucas also claims there were additional errors involving ineffective trial counsel.

The Georgia Supreme Court together with the state habeas court denied relief on all of these claims.   Lucas complains that neither court considered the combined effect of the trial errors.  (Doc. 50 at 139; Doc. 52 at 62-63).   He argues that this Court must perform a *de novo* review of his claim that the combined effect of the errors that infected his trial deprived him of his constitutional rights.   (Doc. 50 at 137).   Lucas cites *Conklin*

*v. Schofield*, 366 F.3d 1191 (11th Cir. 2004), a pre-AEDPA cases in which the Eleventh Circuit explained that "'[a] piecemeal review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, [the habeas petitioner] received a fair trial as is [his] due under our Constitution.'"   *Id*. at 1210 (quoting *United States v. Blasco*, 802 F.2d 1315, 1329 (11th Cir. 1983)).   Unfortunately, Lucas has not cited, and the Court has not found, a post-AEDPA case from either the Supreme Court or the Eleventh Circuit recognizing a freestanding cumulative effect claim.   Other circuit courts are mixed on the issue of whether a claim of cumulative effect or cumulative error is cognizable on federal habeas.[10]

As discussed previously, this Court has not found that any of the state courts' rulings were contrary to, or involved any unreasonable application of, federal law, nor were they based on unreasonable findings of fact.   None of the alleged claims of trial court error, viewed individually, approached the threshold of fundamental unfairness.   Likewise, none of the alleged errors of trial counsel, considered alone, reached the threshold standard of ineffective assistance of counsel.   Additionally, some of the errors of which Lucas complains have been procedurally defaulted.   Taken together, the

---

[10]   The Fourth, Sixth, and Eighth Circuits do not recognize cumulative error claims on federal habeas.   *Fisher v. Angelone*, 163 F.3d 835 (4th Cir. 1998); *Moore v. Parker*, 425 F.3d 250 (6th Cir. 2005); *Wainwright v. Lockhart*, 80 F.3d 1226 (8th Cir. 1996).   The Ninth and Tenth Circuits recognize cumulative error claims.   *Parle v. Runnels*, 505 F.3d 922 (9th Cir. 2007); *Darks v. Mullin*, 327 F.3d 1001 (10th Cir. 2003).

cumulative effect of any of these "errors" falls short of depriving Lucas of a fundamentally fair trial.   "[A] state trial must be so 'fundamentally unfair' as to amount to a denial of due process before federal habeas relief can be appropriately applied." *Bronstein v. Wainwright*, 646 F.2d 1048, 1056 (11th Cir. 1981) (internal citations and quotations omitted).   This Court cannot find that Lucas's "trial, as a whole, was fundamentally unfair and outside the bounds of the Constitution."   *Conklin*, 366 F.3d at 1210.   Thus, the Court denies relief on this claim.

## IV. CONCLUSION

Based on the above, the Court **DENIES** Lucas's Petition for Writ of Habeas Corpus by a Person in State Custody.

## V. CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition.   28 U.S.C. § 2253(c)(1).   Rather, a district court must first issue a certificate of appealability ("COA").   *Harbison v. Bell*, 556 U.S. 180 (2009).   As amended effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases provides that "[t]he district court must issue or deny a [COA] when it enters a final order adverse to the applicant," and if a COA is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

"A [COA] may issue . . . only if the applicant has made a substantial showing of

the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   To merit a COA, the Court must determine that reasonable jurists would find debatable both (1) the merits of the underlying claim and (2) the procedural issues raised.   *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted).

The Court has given substantial consideration to all of the claims and issues contained in Lucas's 28 U.S.C. § 2254 petition.   The Court does conclude that jurists of reason could disagree with the Court's resolution of the following claims and that these particular issues deserve encouragement to proceed further.   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Anderson v. Sec'y for the Dep't of Corr.*, 462 F.3d 1319, 1323 (11th Cir. 2006):

(1)   Lucas's claim that the prosecutor withheld exculpatory evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments and *Brady v. Maryland*, 373 U.S. 83 (1963).   This Court found the claim was procedurally defaulted. (Doc. 27);

(2) Lucas's claim that trial counsel ineffectively handled his videotaped confession, both pretrial and during trial; and

(3) Lucas's claim that trial counsel were constitutionally ineffective for failing to present available mitigation evidence during sentencing.

In relation to all other claims, grounds, and issues presented, the Court finds that the standard shown above for the grant of a COA has not been met.

**SO ORDERED**, this 25th day of March, 2013.


S/   C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT


lnb